

U.S. COURT OF APPEALS
RECEIVED
**Jul 08, 2025**
FIFTH CIRCUIT

**24-40585**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**Nelson E. Willis**
**Plaintiff-Appellant,**

**v.**

**Adam M. Aron**
**Defendant-Appellee,**

### On Appeal from the United States District Court
### For The Eastern District of Texas
### 04:23-cv-00732

## PETITION FOR REHEARING OR REHEARING EN BANC
### Filed under FRAP 40 and Fifth Cir. R. 40.1

## CERTIFICATE OF INTERESTED PERSONS

### Willis v. Aron, No. 24-40585

The undersigned certifies that the following persons and entities have an interest in the outcome of this appeal:

- Nelson E. Willis – Appellant (Pro Se)
- Adam M. Aron – Appellee - CEO Of AMC Entertainment Holdings, Inc.
- AMC Entertainment Holdings, Inc. – Interested Party
- Citigroup Global Markets Inc. – Interested Party
- Antara Capital LP – Interested Party

/s/ Nelson E. Willis
Nelson E. Willis
Appellant, Pro Se

## I. CIRCUIT RULE 35(b)(1) STATEMENT

Appellant has had enough of this institutional mockery. This Court now purports to erase a docket, live hearings, and lawfully served subpoenas. This stops now.

Appellant brought facts, evidence, and legal process. The Court brought omission. This is not oversight—it is evasion. And it ends here.

This Court has effectively endorsed whistleblower retaliation—framing it as constitutional conduct—while reducing Appellant to a disgruntled investor whining about a stock trade. That is a direct violation of due process.

And this is the Court's final opportunity to correct the record and do the right thing: grant judgment in full for the Appellant. If this Court cannot uphold justice, this matter will go to the Supreme Court. Believe it—this is going to the Supreme Court.

This proceeding not only warrants rehearing en banc under both prongs of Rule 35(b)(1)—IT IS MANDATORY.

First, the Panel's unpublished opinion directly conflicts with binding Supreme Court and Fifth Circuit precedent by affirming a dismissal that ignored the fact that the July 21, 2023 First Day of Hearings had begun. AND it was only after that the Appellant served Subpoenas for hostile testimony against the Defendant's testimony and for the production of emails related to the March 14, 2023 rigged shareholder vote as the internal communications declare shareholder fraud and theft of shares orchestrated by the Defendant. The Court throughout has refused to acknowledge this FACT.

In In the Interest of C.A.S., 2003 WL 1787635 (Tex. App.—Dallas Mar. 18, 2003), the court held that a nonsuit cannot override Rule 162 where affirmative claims have been fully filed and are pending. Dismissal of such claims is reversible error. In that case, the counterclaims were dismissed solely because they were "conditionally filed" without the required filing fee. In sharp contrast, the First Day of Hearings in this case had already occurred on July 21, 2023, at 3:00 PM CST. The Defendant failed to appear, and his counsel attempted to proceed by affidavit—an action that violated the Appellant's Sixth Amendment rights, as fully reflected in the hearing transcript filed with Appellant's Principal Brief. Moreover, Appellant had already filed and perfected discovery, including two subpoenas served on July 31, 2023, before the Defendant's same-day attempted nonsuit. These subpoenas were not conditional; they were executed legal process, served by the Johnson County Sheriff's Office. Under TRCP 162, once discovery has commenced, the case cannot be dismissed without a court order. The nonsuit was therefore procedurally void. Any ruling that affirms dismissal without addressing this fact constitutes reversible error under binding Texas law.

After the First Hearing (July 21, 2023) had taken place, then the Subpoenas served, the reaction by Defendant was to file a illegal Notice of Nonsuit (July 31, 2023) to evade discovery under

direct questioning by a hostile witness under oath on August 7, 2023 - 2nd Hearing Day. Seeing that allowed Appellant to move the case to the United States District Court, Eastern District of Texas.

Appellant quickly froze the docket in the 235th and filed a Verified Complaint in the United States, District Court, Eastern District of Texas, Sherman Division immediately for this reason.

### This is the underlying truth -- Not one Judge, clerk, or attorney has used the word "Subpoena or Hearing" once in any document throughout this Court and the lower courts in this case.

This is Erasure of Facts.

### Key Filings from the 235th Judicial District Court Docket (Cause No. CV23-00179)

• **06/26/2023 – Petitioner Adam M. Aron's Notice of Supplemental Evidence in Support of Petition for Protective Order**

• **07/26/2023 – Fee for Issuance of Subpoena (1st subpoena)**

• **07/26/2023 – Fee for Issuance of Subpoena (2nd subpoena)**

• **07/26/2023 – Subpoena Docs Tick Issued to John Merriweather, c/o to Nelson Willis for Service**

• **07/26/2023 – Subpoena Docs Tick Issued to John Merriweather, c/o to Nelson Willis for Service**

**(Two subpoenas issued and directed for service on AMC corporate executive John Merriweather at AMC HQ in Leawood, Kansas.)**

### • 07/31/2023 – Notice of Nonsuit Without Prejudice filed by Petitioner Adam M. Aron.

And it is not the Appellant's problem that the Petitioner in the underlying case—AMC CEO Adam Aron—was a no-show. **His attorney attempted to proceed by affidavit in open defiance of the Appellant's Sixth Amendment right to confrontation.**

Pure evasion and the emails below prove it.

Adam Aron sought a lifetime protective order against the Appellant, a long time shareholder of AMC stock since April of 2021, falsely accusing him of criminal stalking—not because he feared for safety, but because he feared discovery. His attorneys read the Appellant's opposition and immediately understood: this wasn't harassment. It was prosecution. Appellant had evidence of a rigged shareholder vote, insider liquidation, and a fraudulent conveyance concealed under a reverse stock split. The CEO ran—not because he was afraid of emails, but because he knew what cross-examination would uncover.

But not before Defendant formally replied from his Corporate Email Account on April 3, 2023 to Appellant, two months months before he filed the Petition for a Lifetime Protective Order and served Appellant on June 15, 2023.

**On April 3, 2023, at 3:07 AM, Adam Aron responded to the Appellant's ongoing whistleblower inquiries using his corporate email address, AAron@amctheatres.com (mailto:AAron@amctheatres.com).** His message was not fearful or formal—it was personal, mocking, and sarcastic. He wrote:

"This is your 5th hate filled email in a week. Very impressive. If your parents are still alive, and I hope for your sake that they are (no one should wish the pain of grief on another person), I suggest that you show them the emails you sent to me. Imagine how proud they would be of you."

Signed, Adam Aron, Chairman and CEO, AMC Entertainment Holdings, Inc.

This corporate email constitutes direct evidence of retaliatory tone, not protective concern, and confirms that Appellant's shareholder and whistleblower communications were acknowledged, engaged with, and met with sarcasm—not fear. This undermines the basis for any subsequent claims of harassment or stalking, and further supports Appellant's position that the Defendant weaponized the legal system only after Appellant initiated legal discovery and compelled hostile testimony.

This corporate reply confirms that the Defendant (a) personally received and reviewed Appellant's shareholder communications, (b) responded in his official capacity, and (c) engaged directly and sarcastically—negating any claim of fear, harassment, or criminal intent. The email proves retaliatory animus and a knowing attempt to belittle and silence protected speech. It further establishes that when later proceedings were filed against the Appellant, they were not based in truth or safety—they were based in suppression and retaliation.

Aron did not appear at the first hearing. He filed all his evidence. He sent his attorney to continue in his absence. That same Judge and attorney—after failing to admit evidence by affidavit—requested the second hearing on August 7, 2023. Appellant agreed, knowing he would be entitled to hostile cross-examination. But the Defendant never intended to show. Instead, he coordinated his exit. While the hearing was unfolding in Texas, Aron was busy in Delaware executing a parallel pump-and-dump maneuver through Chancery Court—finalizing a rigged vote and liquidating billions in synthetics.

And though the protective order was styled as "criminal," no charges were ever filed. No hearing was ever resumed. No second date was ever honored. Because it was never about protection. It was about suppression.

**Protected Whistleblower Speech is a 1A protection**.

Appellant never contacted Adam Aron as a private person. Every communication was directed to him in his official capacity as CEO of AMC Entertainment Holdings, Inc.—regarding matters of

public concern, including securities fraud, shareholder vote manipulation, and whistleblower retaliation. Criticizing a corporate executive for documented misconduct is not stalking—it is protected speech.

Federal courts must not confuse institutional criticism with criminality. Calling out a public CEO for orchestrating a fraudulent merger—especially after filing evidence with the SEC—is not harassment. It is civic engagement protected by the First Amendment. If CEOs can rig shareholder votes, liquidate billions, and then weaponize protective orders to silence whistleblowers, then this Court is not enforcing the law—it is criminalizing speech.

The Supreme Court has long held that public figures must tolerate sharp criticism, satire, and even "outrageous" language when addressing matters of public concern. See Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it."); New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) ("Debate on public issues should be uninhibited, robust, and wide-open."); Watts v. United States, 394 U.S. 705, 708 (1969) (distinguishing "true threats" from political hyperbole).

As Judge James Ho wrote in Lefebure v. D'Aquilla:

"Judges should not just expect criticism, but embrace it. Sunlight is the best disinfectant… [W]e should be thankful, not offended, when criticism inevitably arrives."
— Lefebure v. D'Aquilla, Nos. 19-30702 & 19-30989, 2021 U.S. App. LEXIS 29212, at *13 (5th Cir. Oct. 5, 2021) (Ho, J., concurring).

The judiciary's attempt to reclassify whistleblower speech as harassment endangers all public-interest disclosures, especially when those disclosures involve corporate fraud, judicial concealment, and procedural sabotage.

The Defendant—then Petitioner—used the courtroom not to prosecute, but to probe. He wanted to see what the Appellant knew. And when it became clear that the Appellant was not just a shareholder but a prosecutor—with evidence, subpoenas, and the law on his side—he ran. This Court is now attempting to launder that escape as lawful.

Appellant never agreed to the nonsuit. He left the matter for the judge to resolve. Judge Janelle Haverkamp did the dishonorable thing: she said nothing. She took no action. She hoped Appellant would go away. Just as this Tribunal now hopes he will go away. But like Judge Haverkamp, this Court has underestimated him.

The Appellant had every right to move this case to The United States District Court Eastern District of Texas, Sherman Division for this exact reason. Appellant found Collusion and Conspiracy to commit fraud on the court laced through out the Judiciary and quickly realized he wasn't only embattled with the Defendant but with the Judiciary running. Opposition Defense for the Defendant.
And Furthermore,
Appellant would never trust a state prosecutorial bench officer with a securities fraud case involving a public CEO, fraudulent conveyance, and whistleblower retaliation. And he was right

not to. Judge Haverkamp had already proven she could not be trusted when she attempted to strip the Appellant of his defense—refusing to hear arguments related to fiduciary breach and constitutional injury. That suppression is preserved in the transcript that Appellant filed with his Primary Brief (Doc. 43) and it is on file with the 235th District Court of Cooke County.

Had this Court read that transcript, it would have seen what took place.

• It would have seen the live hearing.

• It would have seen the subpoenas.

• And it would have known that the nonsuit was fraudulent.

But instead, every judge in every courtroom has chosen to protect the CEO—no matter what the evidence shows.

Appellant can no longer tolerate an Obtuse Judiciary.

This Court apparently hasn't even bothered to read a single document, exhibit, or the hearing transcript submitted by the Appellant.

The trial began. The Petitioner ran—because he realized the Respondent was not a target, but a prosecutor. And now this Court is running defense for the CEO who fled.

That is fatal to this Court's ruling.

Had the Panel read the full record—including the transcript already on file—it would not be the Appellant facing judgment. It would be this Court.

Under Texas Rule of Civil Procedure 162, discovery commenced once that hearing began.
The Defendant had submitted all evidence (TRCP 162).
A state judge issued subpoenas.
The Appellant lawfully served them through Johnson County, Kansas Sheriff's Deputies—after the First Day of Hearings had already commenced.

This is Unlawful EVASION, and the Judiciary is still defending the defendant.

TRCP 162 bars any nonsuit once discovery has begun, unless approved by court order. No such order exists. The nonsuit was void. Yet the Panel affirmed it anyway—and in doing so, erased judicially noticed evidence submitted under Federal Rule of Evidence 201.

Second, this case presents issues of exceptional national importance, including the retaliatory misuse of protective orders to criminalize shareholder oversight, the use of fraudulent nonsuits to suppress whistleblower subpoenas, and the judiciary's reliance on that fraud to achieve dismissal under Rule 12(b)(6).

Either this Court acknowledges the subpoenas—or it acknowledges its own complicity.

The Petition for Protective Order filed against Appellant did not merely seek personal protection—it explicitly weaponized state procedure to silence a corporate whistleblower. It falsely labeled the Appellant a "criminal stalker" for exercising shareholder rights and included a gag provision forbidding contact with the U.S. Securities and Exchange Commission. This was not protection. It was retaliation in legal disguise.

The entire Rule 12(b)(6) dismissal below was built on procedural fraud. The Defendant filed a unilateral nonsuit after subpoenas had been issued and served—an act barred by TRCP 162. That nonsuit was never reviewed or approved by a judge. Yet it was treated by the District Court as dispositive, forming the basis for dismissal. The Panel affirmed that fraud by erasing the timeline entirely. No court—state or federal—has the authority to invalidate ongoing discovery simply to clear a path to dismissal. Yet that is precisely what occurred here.

The Panel disregarded binding precedent requiring courts to acknowledge the commencement of discovery (see Travelers Ins. Co. v. Joachim, 315 S.W.3d 860 (Tex. 2010)), failed to honor the Appellant's invocation of judicial notice under FRE 201(c)(2) (see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)), and ignored unrebutted evidence of fraud on the court (see Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)).

This Court cannot permit dismissals that sidestep subpoenas, nullify state discovery law, and ratify judicial silence in the face of financial fraud. To do so is not just a departure from precedent—it is an institutional endorsement of suppression. It opens the door for every future whistleblower to be buried by process.

Rehearing is not optional. It is mandatory if this Court intends to preserve its integrity and enforce the law it claims to uphold.

This Court—and the lower court before it—trivialized the Appellant to a bug to avoid confronting the scope of securities fraud. Instead of adjudicating lawfully served subpoenas or addressing the documented fraud, the courts reduced a whistleblower to a caricature. That minimization was not oversight. It was strategy. It was protectionism. It was a deliberate refusal to grapple with evidence implicating a sitting CEO, a public company, and the judicial apparatus now shielding them.

The subpoenas were real. The defendant knew Appellant had evidence against him. This is why the Nonsuit was filed:

## II. FORCENSIC ANALYSIS: INTERNAL AMC-CITIGROUP COMMUNICATIONS PROVING INTENTIONAL SHAREHOLDER FRAUD, VOTE MANIPULATION, AND RETALIATORY COVER-UP

**The internal emails embedded directly below this analysis form a direct evidentiary trail of the scheme that precipitated the fraudulent nonsuit and premeditated strategy to disenfranchise shareholders and theft of their rights and shares.**

These communications—exchanged between May and December 2022 by AMC executives, Citigroup bankers, external vote-rigging consultants at D.F. King, and financial strategists at B. Riley Financial—establish that the March 14, 2023 shareholder vote was structurally prearranged. The Defendant fled discovery only after realizing these internal communications would be exposed through lawful subpoena.

• **May 17, 2022** – D.F. King outlines a vote-simulation model designed to manipulate proxy outcomes using NYSE "routine" voting rules, broker discretionary authority, and custodial forecasting. It details how vote thresholds could be manufactured by targeting uninstructed shares—despite clear evidence of collapsing retail support.

• **May 27, 2022** – B. Riley Financial, in coordination with AMC executives and legal counsel at Duane Morris LLP, proposes a super-voting preferred structure. The exchange shows early efforts to shape vote control mechanisms while masking dilution and regulatory scrutiny—proving premeditation.

• **July 21, 2022** – Internal communications confirm AMC's plan to register 1 billion PEUs—not just for a dividend, but to fund an ATM cash-raise through synthetic dilution. Executives acknowledge anticipated backlash: "We will get ire no matter what the number is."

• **December 8, 2022** – Citigroup coordinates a final vote-buying agreement with Antara Capital. AMC commits to bond repurchases and securing a rigged vote in exchange for Antara's loyalty and APE sale restrictions. Citigroup also demands input on the press release—exposing the use of public disclosures as investor misdirection.

• **"Project Popcorn: Follow-Up Items" (Doc. 109-2)** – Citigroup's internal planning memo outlines the structuring and timing of APE offerings, including automatic sales of unused rights, offering cancellation thresholds, and narrative management for investor optics.

This is not speculation. These are the Defendant's own communications—already on file in this tribunal and the lower court, judicially noticed, procedurally unrebutted, and ignored by the Panel. The nonsuit was not a defense. It was a concealment tactic. And Project Popcorn a massive Clean-Up Operation that runs very deep.

The Appellant's subpoenas were a direct threat to that suppression. The Defendant ran. The Court buried it.

## BELOW ARE EMAILS SUBMITTED AS EVIDEMCE IN THE LOWER COURT AND THIS COURT DOC50.

**Date:**
**Thursday, December 8 2022 03:11 PM**
**Subject: RE: Antara**
**From:**

**Van Zandt, Derek «derek.vanzandt@citi.com (mailto:derek.vanzandt@citi.com)>
To:**
**Adam Aron <AAron@amctheatres.com (mailto:AAron@amctheatres.com)>; Sean
Goodman «SeGoodman@amctheatres.com (mailto:SeGoodman@amctheatres.com)>:
Kevin Connor «KConnor@amctheatres.com (mailto:KConnor@amctheatres.com)>; CC:
Gonzalez, Cristian < cristian.gonzalez@citi.com (mailto:cristian.gonzalez@citi.com)>;
Mikullitz, Mark <mark.mikullitz@citi.com (mailto:mark.mikullitz@citi.com)>; Kak,
Shiv «Shiv.Kak@citi.com (mailto:Shiv.Kak@citi.com)>; Meadows, Cass
<cass.meadows@citi.com (mailto:cass.meadows@citi.com)>;**

Just spoke with Himanshu. He was very positive on yesterday's meeting.

They want to proceed but are limited to $150mm in size due to risk limits but believe they can
stretch it to $190mm with the repurchase of their $100mm face of 21s at 40.

He is willing to allocating value to the bonds to provide for a higher APE price but we need to
think this through. $190mm purchase of APEs at 20% discount.

AMC purchases their $100mm 2L notes @ 40.

AMC commits to proceeding with vote.

Antara agrees to hold shares until vote and vote in favor.

He wants AMC restricted from selling more APEs until after the vote including converts.
Restriction lifted if APES >$3. Also, willing to be supportive of AMC adding more liquidity
from ATM program if >$3.

Wants participation in 8k/ Press release drafting.

Available for public information diligence on Monday in KC (Adam and / or Sean).

Target transaction timeframe next week.


**From: Van Zandt, Derek [ICG-BCMA]**
**Sent: Thursday, December 8, 2022 1:19 PM**
**To: Adam Aron (aaron@amctheatres.com (mailto:aaron@amctheatres.com)); Sean
Goodman**
**Subject: Antara**

Adam / Sean - Attached is a preliminary ownership and vote analysis based on various
investment scenarios with Antara. We probably need to discuss size considerations relative to
20% threshold with your lawyers and any governance / control implications.

I am talking to Antara at 2pm ET to connect following vesterday's lunch.

Derek


**From: Weinberg, Geoffrey gweinberg@dfking.com (mailto:gweinberg@dfking.com)>
Sent: Tuesday, May 17, 2022 8:31 PM**
**To: Kevin**
**Connor KConnor@amctheatres.com (mailto:KConnor@amctheatres.com)>;Eddie
Gladbach EGladbach@amctheatres.com (mailto:EGladbach@amctheatres.com)>
Cc: Taitt-Harmon, Mercedez Mercedez. Taitt-Harmon@weil.com (mailto:Taitt-
Harmon@weil.com)>; Chivers,
Corey corey.chivers@weil.com (mailto:corey.chivers@weil.com)>; Stein,
Michael Michael.Stein@weil.com (mailto:Michael.Stein@weil.com)>; Scrudato,
Krystal kscrudato@dfking.com (mailto:kscrudato@dfking.com)>**

**Subject: Re: AMC - Preferred Issuance**

Kevin -

As discussed, for the preferred structure to be successful, the votes cast must be at least 50% + 1 FOR. This is effectively a majority of votes cast standard and a much lower threshold than our previous voting standard of majority of shares outstanding where we required FOR votes from 50% + 1 of the entire shareholder base, not just those that actually vote. From there, the question becomes the likelihood that we would receive support from a majority of votes cast.

Due to (i) the fact that institutional shareholders do not like to vote until just prior to the meeting and ii) that both previous votes were pulled at least a week prior the meeting, our analysis is focused on (a) the vote up until the day that the proposal was withdrawn, (b) certain assumptions for how the routine vote (as discussed below) would have been applied, and (c) how the shareholder base has changed since last year.

Based upon last year's voting, incorporating the estimated routine vote that would have been applied, the votes cast would have been ~56% FOR prior to the institutions voting, with a ~31.5mn vote difference between FOR and against. Based upon certain assumptions of what institutional shares would have been voted after the proposal was withdrawn, taking a conservative approach, an additional 10mn FOR votes would have been added, increasing the FOR % to 57.7% and the vote difference to 41.5mn shares.

We start with an advantage in achieving a majority of votes FOR as NYSE should consider this proposal a "routine proposal" - this means that brokers that still maintain their discretionary voting authority will apply that voting authority to vote their customers' uninstructed accounts. These vote in two different ways:

• Discretionary voting - where brokers will vote any uninstructed shares with management's recommendations; ~64 mn shares as of the latest available data, of which we would anticipate splitting 53mn FOR / 11mn against based upon previous voting patterns.

• Proportionate voting - where brokers will vote any uninstructed shares in the same proportion that their instructed shares were voted (e.g., Broker X has 10mn customers' shares, 2mn vote, 1mn of the 2mn that vote, vote FOR - the remaining 8mn uninstructed shares are voted 50 / 50 FOR and against); *103.5mn shares as of the latest available data, of which we would anticipate splitting 27.4mn FOR / 76.1mn against based upon previous voting patterns.

Since the July 2021 vote, the shareholder base has changed as follows:

• Institutional custodial holdings have increased by ~27.4mn shares; these tend to vote in favor of the proposal and participate as well (net positive)

• Discretionary custodial holdings have decreased by 14.2mn shares; we will no longer automatically receive those positive votes at an 80%+ rate (net negative)

• Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted proportionately to how the rest of NFS' instructed shares vote. Last year these groups of shares voted 29% FOR (net negative)

• Friendlier proportionate custodial holdings (e.g., Goldman, MLPFS, etc.) decreased by ~12.5mn shares, those custodians voted overwhelmingly in favor of the proposal last year (net negative)

Based upon certain assumptions, including the likely number of shares actually votable by the index funds due to stock loan, with the same retail voting FOR rate of 28.06% and retail participation of 27% (compared to 25.11% at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust, there would be a voting spread in favor of the proposal of ~5mn shares with the votes cast split at

51.11% FOR & 48.89% against. This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for. However, this 47mn share difference may be largely negated by the combined ~36.5mn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base. With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful. At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robinhood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%. At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to 26.5% or below, the initial ~5m share advantage disappears.

If helpful, attaching the latest ownership report based upon the 13F data that came due this week. Let me know any questions. Happy to discuss.

Thanks, Geoff

DISCLAIMER: This analysis contains information provided by or derived from sources believed to be reliable and accurate. D.F. King & Co., Inc. ("King") is not responsible for any errors or omissions, or for the results obtained from the use of any such information. This Reportis provided "as is", with no guarantee of completeness, accuracy, timeliness or of the results obtained from the use of this information, and without warranty of any kind, express or implied, including, but not limited to warranties of performance, merchantability and fitness for a particular purpose. AMC Entertainment Holdings, Inc. (the "Company") is solely responsible for any decisions, actions, or omissions taken, and, in no event will King, its affiliates, officers, directors, employees, agents, or other representatives be liable to the Company or anyone else for any errors, omissions, or for any adverse consequences resulting from the reliance on any aspect of this Report or the information contained herein.

Geoffrey Weinberg
Senior Managing Director
T: 212.786.2704
M: 917.473.2984 / 732.688.2504
E: gweinberg@dfking.com (mailto:gweinberg@dfking.com)


**Date:**
**Subject:**
**From:**
**To:**
**Friday, May 27 2022 05:58 PM**
**RE: super voting pref**
**Jon Merriman <jmerriman@brileyfin.com (mailto:jmerriman@brileyfin.com)>**
**Sean Goodman «SeGoodman@amctheatres.com (mailto:SeGoodman@amctheatres.com)>;**
**John Merriwether**
**<JMerriwether@amctheatres.com (mailto:JMerriwether@amctheatres.com)>;**
**CC:**
**Patrice McNicoll <pmcnicoll@brileyfin.com (mailto:pmcnicoll@brileyfin.com)>; Layne**

Rissolo <irissolo@brileyfin.com (mailto:irissolo@brileyfin.com)>; Colucci, Dean M.
<DMColucci@duanemorris.com (mailto:DMColucci@duanemorris.com)>; Seery, James T.
<JTSeery@duanemorris.com (mailto:JTSeery@duanemorris.com)>;
Openinc_20211015_424B5 (Final Prospectus - Priced Offering (S-3)).pdf;
Avingerinc_20220113_424B5
Attachments: (Final Prospectus - Continuous Offering (S-3)).pdf;
AgileTherapeuticsinc_20220314_424B5 (Preliminary
Prospectus (S-3)).pdf
Weekend reading - talk soon
Jon Merriman
Chief Business Officer
B. Riley Financial
415 500 5712
**From: Jon Merriman**
**Sent: Friday, May 27, 2022 1:40 PM**
**To: Sean Goodman; John Merriwether**
**Cc: Patrice McNicoll; Layne Rissolo; Colucci, Dean M.; Seery, James T.**
**Subject: super voting pref**
Sean, John - great to see you guys this week - thank you so much for coming out to our event.
Sean I hope you didn't have equal drama on the way home - what a story!
Suggest we get on a call with the lawyers next week and talk on this structure. Then you and
your team can get with the NYSE and see if this y could work for AMC. In the meantime Layne
would you please send the Nasdaq precedents.
Copied our counsel at DM who has helped us here. Suggest Tuesday at 10EST to start.
Great weekend everyone!
Jon
Jon Merriman
Chief Business Officer
B. Riley Financial
415 500 5712


**PLEASE VISIT http://brileyfin.com/disclosures (http://brileyfin.com/disclosures)**

**ONFIDENTIAL**
**AMC_00019707**

**THIS DOCUMENT IS A CONFIDENTIAL FILING.**
**ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

**Date:**
**Subject:**
**From:**
**To:**
**Thursday, July 21 2022 12:40 PM**
**Re: Citi Questions - PEU ATM**
**Sean Cioodman**

John Merriwether
<[JMerriwether@ametheatres.com](mailto:JMerriwether@ametheatres.com) (mailto:[JMerriwether@ametheatres.com](mailto:JMerriwether@ametheatres.com))>;
Kovin Connor <[KConnor@ametheatres.com](mailto:KConnor@ametheatres.com) (mailto:[KConnor@ametheatres.com](mailto:KConnor@ametheatres.com)) ; Eddie
Gladbach
CC:
EGladbach@ametheatres.comp:
Attachments: image001.png; image00l.png
Thanks John
I think 1B makes sense.
Defer to the lawyers regarding the 5-3.
Scan
Sent from my iPhone
On Jul 21, 2022, at 12:33 PM, John Merriwether wrote:
Gentlemen,
Derek called me after the call with a few logistical questions regarding the 5-3 and ATM plans..
Privileged - Redasted
• There had been some discussion about how many PEUs we would register and 1B was
discussed (517M for the dividend and then the remainder for the ATM). Are we in agree ent that
the number is 1B? There is a sweet spot somewhere that doesn't raise the shareholders' ire about
dilution but also gives us the flexibility to raise the capital we want. I think we will get ire no
matter what the number is, so does it make sense to get the ire out all at once at 1B.
Thanks, John
amo
ENTERTAINMENT
John Merriwether
Vice President, Capital Markets and Investor Relations
One AMiC Way
11500 Ash Strect, Leawood, (S66211
office: 913-213-2660
mobile: 239-398-8366
CONFIDENTIAUTY NOTICE: Thist tui message includingatsch rents, if ary. aintended for
the person o emity to ohich it saddmased and maycortain contidential and/ar prap etary matarial.
any uns nhorised reste, aso, disclosers or estrout on is provib ted, if you are rot theinterded rec
plent, pease contact the sender apreply e-mali and destroy al coples of the onana message
CONFIDENTIAL
4MP กกกวดวด
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.


Case 4:23-cv-00732-ALM-KPJ Document 109-2 Filed 09/03/24 Page 2 of 3 PagelD #: 18
Follow-Up Items
Item
Process Ow
Rights Offering Structure
Would an incremental approach be preferable (1.0. muitiple rights offenings, starting smaller and

going larger if successfuly?

Citi

2

Can shareholders also indicate interest in buying any residual rump shares?

Citi

How would it work if shareholders receive fractional rights but do not have enough rights to purchase a full APE /CSE?

Could we include and what are the implications of a structure where low volume holders (1 share, 2 shares, etc ) sull receive a minimum of at least one full right? What incentives are created and what are potential negative impacts?

Cit

Citi

5

Can rights be structured so that they are automatically sold if not exercised by a certain time?

Shou'd there be a minimum sign-up clause where, under a certain threshold, the offering is caled olf? For example, at least 25 million or nothing.

Timing / Messaging

Citi / Counsel

Citi / Counsel

identify and on-board a PR / IR fum to assist with communication

AMC / Citi

When is the optimal time to go to marke: (e g. January vs. March / post earnings)?

AMC

What wit the timing be from announcement to ex-date for the rights? What are the consideration is setting / determining that? Cit What will be the UoP and narrative for investors on why AMC is accessing the markets now?

AMC

Shareholder Considerations

What would be the mechanics of trading the fractional rights on brokerage platforms?

Cit

What are the steps brokerage /trading platforms will be required to take to communicate the offer to their customers?

Cite

13 How wil index funds manage their rights?

Cit

14 Any issues with foreign shareholders?

Citi / Counsel

CONFIDENTIAL

AMC_00

## III. TABLE OF CONTENTS

• **Certificate of Interested Persons** ……………………………………………PAGE  1

**Section I. • Circuit Rule 35(b)(1) Statement** ……………………………………PAGE  2

**Section II. • Forensic Analysis: Internal AMC-Citigroup Communications
        Proving Intentional Shareholder Fraud, Vote Manipulation,
        and Retaliatory Cover-Up** ……………………………………PAGE  7

**Section III. • Table of Contents** ……………………………………………PAGE 15

**Section IV. • Table of Authorities** ……………………………………………PAGE 15

**Section V. • Statement of the Issue** …………………………………………  PAGE 17

**Section VI. • Statement of Facts and Proceedings** …………………………   PAGE 18

**Section VII. • Argument** …………………………………………..…………PAGE 20

**Section VIII. • Conclusion** …………………………………..…………...PAGE 23

• **Certificate of Service** ……………………………………………PAGE 24

• **Certificate of Compliance** ……………………………………………PAGE 24

## IV. TABLE OF AUTHORITIES

### Cases:

• **In the Interest of C.A.S., No. 05-02-01223-CV, 2003 WL 1787635 (Tex. App.—Dallas Mar. 18, 2003, no pet.) (mem. op.).**

• **Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)
(fraud on the court doctrine)**

• Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
(judicial notice and securities fraud pleading standards)

• BHP Petroleum Co., Inc. v. Millard, 800 S.W.2d 838, 841 (Tex. 1990): "The plaintiff's right to a nonsuit is unqualified and absolute… only before the defendant has made a claim for affirmative relief or discovery has begun."

• Travelers Ins. Co. v. Joachim, 315 S.W.3d 860 (Tex. 2010)
(Texas Rule of Civil Procedure 162; limitations on nonsuit after discovery begins)

• In re John D. Hanby, No. 14-09-00896-CV (Tex. App.—Houston [14th Dist.] Feb. 11, 2010): While mirror-image declaratory claims don't bar nonsuit, discovery does.

• Haines v. Kerner, 404 U.S. 519 (1972)
(liberal construction of pro se filings)

• Le v. Kilpatrick, 112 S.W.3d 631, 634 (Tex. App.—Tyler 2003): A nonsuit does not vitiate a trial court's prior ruling once discovery has begun.

• United States v. Zuniga, 720 F.3d 587 (5th Cir. 2013)
(judicial notice under FRE 201(c)(2))

• Funk v. Stryker Corp., 631 F.3d 777 (5th Cir. 2011)
(appropriate scope of judicial notice in dismissal context)

• In re Katrina Canal Breaches Litig., 495 F.3d 191 (5th Cir. 2007)
(limits of judicial notice and Rule 12(b)(6) dismissals)

## Rules:

• Fed. R. App. P. 40
(Petition for Panel Rehearing)

• 5th Cir. R. 40.1
(Requirements for en banc rehearing)

• Fed. R. Evid. 201(c)(2)
(Mandatory judicial notice upon request with supplied sources)

• Fed. R. Civ. P. 12(b)(6)
(Dismissal for failure to state a claim)

• Tex. R. Civ. P. 162
(Limits on nonsuit after discovery begins)

# V.  STATEMENT OF THE ISSUE

This case must be reheard, and ruling reversed and judgment in full for Appellant Granted.

This Court cannot ignore:

July 21, 2023 hearing in the 235th District Court—documented in (Doc43 Transcript Exhibit) —exposed multiple constitutional violations that were never acknowledged by this Court. The panel opinion ignored the hearing transcript, suppressed judicially noticed evidence, and erased procedural and evidentiary facts to protect a powerful corporate defendant.

Appellee Adam Aron did not appear at the hearing he initiated. His attorney, Meghann Reeves, attempted to proceed by affidavit—an unconstitutional move that violated Appellant's right to confront his accuser. The judge sustained Appellant's objection, rejected the affidavits, and confirmed that Aron could not seek a protective order without appearing for cross-examination. This courtroom admission destroyed the evidentiary basis of the protective order, but the Fifth Circuit erased it entirely.

The hearing also proved that Appellant's constitutional right to present a full defense was denied. The Court restricted argument strictly to the protective order, blocking all evidence of whistleblower retaliation and corporate fraud—despite Appellant being labeled a criminal stalker for contacting the CEO in his official capacity. These facts are on the record, in the transcript, and judicially noticed under FRE 201.

Yet the Fifth Circuit issued an opinion that never once cited the hearing, the transcript, or the subpoenas that followed. That omission is not oversight—it is deliberate suppression.

Central Question:

Can a federal court affirm a Rule 12(b)(6) dismissal by pretending the July 21 hearing never happened, pretending subpoenas don't exist, and erasing TRCP 162 violations that voided the nonsuit?

The following questions demand rehearing and immediate reversal in full judgement for the Appellant:

1. Whether a Rule 12(b)(6) dismissal can stand when it is procedurally void under TRCP 162—because First Day of Hearings had already occurred on July 21, 2023 at 3:00PM CST and discovery had commenced through valid subpoenas served on July 31, 2023, following a live

hearing on July 21.

2. Whether the Court may suppress a transcript (Doc43) proving that defense counsel attempted to proceed by affidavit in violation of due process—and that the judge rejected that attempt on the record.

3. Whether a protective order obtained through constitutional violations, procedural misconduct, and factual erasure can serve as the legal foundation for dismissing a federal civil rights and securities fraud case.

4. Whether judicial notice under FRE 201(c)(2) can be discarded when it includes court transcripts, subpoena dockets, and internal whistleblower evidence that render the dismissal baseless.

5. Whether the Fifth Circuit may lawfully affirm a ruling that erases governing law (TRCP 162), suppresses material filings, and ignores whistleblower retaliation against a shareholder who contacted the SEC and was falsely labeled a stalker.

This is not a "failure to state a claim." It is a courtroom cover-up. The ruling must be reversed, and judgment in full entered for the Appellant.

The Court must rehear this case. It cannot erase subpoenas, suppress evidence, and deny due process—then pretend justice was done. This Tribunal is looking at Appellant—The Precedent.

## VI. STATEMENT OF FACTS AND PROCEEDINGS

On July 21, 2023, a formal hearing was held in the 235th District Court (Cause No. CV23-00179) on Petitioner's application for a protective order. Adam M. Aron—CEO of AMC Entertainment—did not appear. His counsel attempted to submit an affidavit in lieu of live testimony. Judge Janelle Haverkamp summarily rejected the affidavit and admonished counsel, stating: "By whose authority did you think you could come in here and submit evidence by an affidavit? […] I'm not allowing you to—no one asked permission of the Court."

At that same hour, Aron was participating in a critical sequence of events in Delaware Chancery Court, where Vice Chancellor Morgan T. Zurn initiated a coordinated pump-and-dump with AMC. In the friendly lawsuit Case No. 2023-0215-MTZ, Allegheny County Employees Retirement System v. AMC Entertainment Holdings, Inc., Vice Chancellor Zurn first denied, then one week later granted, a controversial settlement. That settlement enabled AMC's 10:1 Reverse Stock Split and Merger, which liquidated billions of tokenized shares tied to Project Popcorn and finalized the rigged vote.

Appellant filed an Affidavit of Merit in that very case, alerting Vice Chancellor Zurn to the highly irregular nonsuit filed by Aron—after hearings had commenced and subpoenas had been issued.

The Notice of Nonsuit in Texas was filed after the hearing and after Aron's colleague, AMC Vice President of Investor Relations, had been subpoenaed. This would have allowed Appellant to cross-examine both executives and extract conflicting statements—he was prepared with interrogatories.

On July 31, 2023, Appellant lawfully issued and served two subpoenas directed at AMC executive John Merriweather: one to compel his appearance as a hostile witness, and the other a subpoena duces tecum demanding production of internal communications. Both subpoenas were issued by the 235th District Court and served by Johnson County, Kansas Sheriff's Deputies at 8:30 AM at AMC's corporate headquarters in Leawood, Kansas. Under Texas Rule of Civil Procedure 162, the issuance and service of subpoenas constitutes the commencement of discovery, which bars any unilateral nonsuit absent a court order. No such order was ever sought or entered.

The nonsuit was filed anyway. The attorneys, now clearly working with the court, gambled that a pro se litigant wouldn't catch the violation. It was accepted by the state court clerk with no judicial review.

This sequence—hearing first, subpoenas second, nonsuit last—renders the nonsuit void as a matter of law. It demonstrates a coordinated strategy to evade examination and suppress evidence across jurisdictions. No court has the authority to erase valid discovery in this manner. The Fifth Circuit's failure to even reference this timeline, or the subpoenas themselves, is a constitutional and procedural violation that demands rehearing and immediate reversal.

Appellant expected the lower court to recognize the obvious: that discovery had lawfully commenced, that subpoenas had been issued and served, and that the nonsuit was procedurally void. Instead, the court ignored every legal trigger, refused to address the subpoenas, and dismissed the case under Rule 12(b)(6)—as if none of it had happened. That betrayal set the tone for everything that followed.

So what if the Appellant sent a few angry emails? Why didn't the Defendant simply block Appellant's communications? Ego and guilt. That's why. This CEO was not just evading scrutiny—he was implicated in multiple forms of misconduct, including having to account for sexually explicit material uncovered in United States v. Sakoya Blackwood, No. 1:23-cr-00422 (S.D.N.Y.), a federal criminal case that raised questions about AMC executives' conduct. He was also rigging shareholder votes, executing a fraudulent conveyance, and offloading billions in synthetic AMC equity through the scheme known internally as "Project Popcorn."

The Appellant wasn't confused. He was informed. And he was angry—because he understood exactly what was happening.

That's why the Appellant contacted the U.S. Securities and Exchange Commission. He provided them with internal emails and corporate communications—many of which are now embedded in this Petition. The SEC saw the same smoking-gun documents. They knew the Reverse Split was a fraud engineered from within. And they did nothing.

Everyone protected the Defendant. Every court, every clerk, every regulator. The Appellant, meanwhile, was treated like a nuisance, like a bug to be squashed —discarded, disbelieved, and disrespected by the very institutions meant to protect Appellant. Appellant brought irrefutable evidence. Appellant followed the law. And instead of adjudication, Appellant got a cover-up. This Court had the chance to fix that. Instead, it joined the suppression.

# VII. ARGUMENT

If this Court can ignore a governing state procedural rule, disregard that Hearings had already commenced, ignore that subpoenas were lawfully served after those Hearings began, and legitimize a protective order that was used to ruin a shareholder's life—and a nonsuit used to evade discovery while the Defendant's colleague was under direct questioning and oath— then this is no longer a Court of Appeals. It is a Court of Erasure.

The record shows discovery was live. The subpoenas were real. The Defendant fled. The judiciary assisted. And this Panel just affirmed it.

This is this Court declaring the Appellant may not build a case, that the Appellant is incapable of intelligent strategy.
How dare you.

The Appellant's filing of lawful subpoenas after the July 21, 2023 hearing—while the Defendant's colleague was still under scrutiny—triggered Texas Rule of Civil Procedure 162. The rule bars any nonsuit absent a court order once discovery has commenced. The subpoenas were stamped, filed, served by law enforcement, and submitted to this Panel. They were never rebutted. They were judicially noticed under FRE 201. They were procedurally valid and factually determinative.

Yet this Panel has not only ignored them—it has issued an opinion that never once says the word subpoena, never mentions TRCP 162, and affirms a dismissal that rests on procedural fiction. The ruling is not an oversight. It is a deliberate act of omission—because acknowledging the subpoenas would collapse the entire foundation of the lower court's ruling.

The Eastern District relied on a nonsuit that was void under TRCP 162 to extinguish whistleblower discovery—after that discovery had already begun. This Court was made aware of that violation in multiple filings:
• Doc. 43 – Appellant's Principal Brief (not rebutted)
• Doc. 67-1 and 67-2 – Affidavit of Merit (not rebutted)
• Doc. 79 – Motion for Judicial Notice under FRE 201 (denied without explanation)
• Doc. 107-2 – Amended Summary Judgment (not rebutted)

The Panel ignored every one of those filings.

And it did so in a case where the Appellant had already served two subpoenas—one to compel in-person testimony, and one duces tecum—on John Merriweather, AMC's Vice President of Capital Markets. These subpoenas were served at 8:30 a.m. on July 31, 2023, at AMC headquarters in Leawood, Kansas, by the Johnson County Sheriff's Office. The record contains the docket entry confirming the subpoenas were filed and issued on July 26, 2023. The hearing had already occurred. The Defendant's representative had already been sworn in. And yet the Court treated the nonsuit as valid—without ever acknowledging that discovery had begun and was protected by TRCP 162.

The Panel's omission is not just legal error—it is concealment. And it has resulted in a published affirmation that now stands for the principle that a litigant can flee discovery, hide internal fraud, and weaponize a protective order to silence a whistleblower—and the federal judiciary will uphold it by deleting subpoenas from the record.

This is not appellate review. It is institutional laundering of misconduct.

Under Texas Rule of Civil Procedure 162, "[a] plaintiff may dismiss a case… before the plaintiff has introduced all of his evidence other than rebuttal evidence. A dismissal may not be made… after the plaintiff has been served with a motion for summary judgment, or after the case has been submitted to the court… or after discovery has been initiated, except upon order of the court." (emphasis added).

This Court has completely omitted the most basic threshold fact in this case: Hearings had commenced.

On July 21, 2023, in the 235th District Court of Texas, the Court convened a live evidentiary hearing.

Then came the subpoenas.

On July 26, 2023, two subpoenas were issued by the same Court:
1. a Subpoena to Appear and Testify at Hearing, and
2. a Subpoena Duces Tecum compelling production of internal communications related to AMC, and the vote manipulation scheme outlined in the internal emails embedded here.

On July 31, 2023, both subpoenas were physically served by Johnson County, Kansas Sheriff's Deputies at AMC headquarters in Leawood, Kansas. They were served on John Merriweather personally at 8:30 AM. These facts are not disputed. They are documented in the lower court docket (Exhibit A), and embedded in the appellate record through Docs. 45, 50, 79, and 107.

At that point, Hearings had commenced, and Discovery had begun. TRCP 162 is crystal clear: once either of those events occurs, a plaintiff cannot file a unilateral nonsuit without a court order.

No court order was ever issued.

The Appellant made sure the Judge Janelle Haverkamp could not issue an Order. Appellant filed a Motion for Summary Judgment on the Docket immediately following the Nonsuit, while the Case Was In The District Court.

Instead, a fraudulent Notice of Nonsuit was filed in the shadow of those subpoenas—after Hearings, and after the Court rejected the Defendant's affidavit submission. This was not dismissal. This was evasion.

Appellant's strategy was effective. The Defendant fled after hearings began, subpoenas were served, and discovery commenced. Appellant did not respond to the nonsuit because he had no obligation to do so once discovery had begun. Instead, Appellant immediately moved the case to federal court—after Judge Janelle Haverkamp took no action on the nonsuit. This sequence preserved the discovery record and transferred the dispute into a forum that could no longer rely on procedural fiction.

Then Judge Amos Louis Mazzant, III commits and finalizes Reversible Error.

The Panel attempts to sidestep this with citations to Travelers Ins. Co. v. Joachim, 315 S.W.3d 860 (Tex. 2010), and Univ. of Tex. Med. Branch v. Estate of Blackmon, 195 S.W.3d 98 (Tex. 2006), which confirm a plaintiff's general right to nonsuit—but only before discovery or hearings begin. Those cases do not apply. This is not theory. This is record.

The Court's silence on TRCP 162 is not neutral. It is willful omission. The nonsuit was procedurally void, and the Panel's refusal to acknowledge the active subpoenas, the July 21 hearing, and the sworn testimony of Defendant's executive constitutes a direct breach of the governing law.

This was not a courtroom error. This was judicial laundering of a rigged dismissal.

The Panel Opinion Conflicts with Governing Law

The Panel's ruling in this case must be reversed. It is not merely legally incorrect—it constitutes one of the most deliberate acts of judicial protectionism ever recorded in a civil proceeding. The Panel did not rule on the law; it erased the law to shield a defendant from facing it. What occurred here is not adjudication—it is collusion, with the federal judiciary operating as a procedural bodyguard for a CEO facing documented evidence of securities fraud.

This Court did not just overlook facts. It buried subpoenas. It ignored governing state and federal law. And it ratified a lower court decision that dismissed a case on grounds that were facially false, procedurally void, and substantively unconstitutional.

The subpoenas issued by the 235th District Court on July 26, 2023, were lawfully served by Johnson County, Kansas Sheriff's Deputies on July 31, 2023—after a formal hearing had already taken place on July 21, and just days before the second hearing. These subpoenas were not

directed at an entity. They were personal: one to compel the testimony of AMC executive John Merriweather as a hostile witness, the other to compel production of internal communications revealing vote manipulation and fraudulent coordination with Citigroup and Antara Capital. These filings triggered Texas Rule of Civil Procedure 162, which expressly bars nonsuits after discovery has commenced unless approved by court order.

No such order was ever entered.

Instead, the defendant filed a fraudulent nonsuit—not to resolve the case, but to avoid the second hearing and nullify subpoenas that would have placed their internal emails under hostile cross-examination. The District Court accepted that strategy wholesale. The Fifth Circuit then ratified it by deliberately omitting the subpoenas from its opinion. That omission is not harmless. It is dispositive.

No federal appellate court can affirm a Rule 12(b)(6) dismissal that relies on a procedurally void nonsuit. No court can lawfully erase subpoenas that had already been served and judicially noticed. And no judge, under color of law, can pretend the case ended before it began when the record proves the opposite.

The Panel opinion does all three. It fails to cite TRCP 162. It fails to acknowledge FRE 201(c)(2) judicial notice of the subpoenas. And it entirely omits Exhibit A, the certified state docket, which documents the precise sequence of service and the absence of judicial approval. These are not oversights. They are suppressions.

The law was broken to protect the defendant. The judiciary didn't just permit it—they participated. That conflict with governing law demands reversal.

## VIII. CONCLUSION

This Court cannot lawfully affirm a Rule 12(b)(6) dismissal that rests on a procedurally void nonsuit, ignores governing state procedural law, and erases judicially noticed subpoenas that were both lawfully issued and personally served.

The subpoenas served on July 31, 2023—after a live evidentiary hearing had already occurred—triggered Texas Rule of Civil Procedure 162, which explicitly bars any unilateral nonsuit unless approved by court order. No such order was ever entered. The lower court relied on that fraudulent nonsuit anyway. The Panel then affirmed it—without mentioning TRCP 162, without citing the subpoenas, and without acknowledging the judicial notice filings that brought those subpoenas before this Court under Federal Rule of Evidence 201(c)(2). That is not adjudication. It is procedural concealment.

This Court's opinion fails on every required front:
• It omits the governing state rule (TRCP 162);
• It refuses to acknowledge judicially noticed, unrebutted evidence (FRE 201);
• It disregards the constitutional implications of a retaliatory protective order used to criminalize a whistleblower and silence contact with federal regulators;

• And it knowingly affirms a dismissal premised on erasing discovery that had already commenced.

The Appellant followed the law. He issued subpoenas from a sitting court. He served them through Sheriff's Deputies. He noticed them into the record. He provided unrebutted internal corporate emails proving securities fraud. He followed the rules of evidence. He anticipated the misuse of the nonsuit and filed strategically to expose it. And yet every step—every document, every procedural protection—was ignored or deleted by this Court.

The Panel's opinion has now set a catastrophic precedent: that courts may legitimize retaliation, suppress whistleblower discovery, and extinguish valid subpoenas by pretending they never happened. That is not harmless error. That is structural error. And it demands correction.

If this Court permits this ruling to stand, it is not simply affirming a dismissal—it is codifying the laundering of judicial process to protect a sitting CEO from hostile testimony, shareholder accountability, and exposure of internal fraud.

That is not the role of the judiciary.

Rehearing is mandatory. The integrity of the Court is now on the line.

## CERTIFICATE OF SERVICE

I certify that on July 8, 2025, a true and correct copy of the foregoing Petition for Rehearing or Rehearing En Banc, including all attached exhibits, was served via CM/ECF on all counsel of record, and that no party requires service by other means.

Respectfully submitted,

/s/ Nelson E. Willis
Nelson E. Willis
Pro Se Appellant
1405 County Road 208
Gainesville, Texas 76240
nelsonwillis3@gmail.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32 and 40 because, excluding the portions exempted by Fed. R. App. P. 32(f), this Petition contains 8,554words, as confirmed by the word count feature of the word processing system used to prepare it.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

/s/ Nelson E. Willis
Nelson E. Willis, Pro Se
Plaintiff-Appellant
1405 County Road 208
Gainesville, Texas 76240
nelsonwillis3@gmail.com

# United States Court of Appeals
# for the Fifth Circuit

––––––––––––––

No. 24-40585
Summary Calendar

––––––––––––––

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2025

Lyle W. Cayce
Clerk

Nelson Willis,

*Plaintiff—Appellant*,

*versus*

Adam M. Aron,

*Defendant—Appellee*.

––––––––––––––––––––––––––––––––––––

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:23-CV-732

––––––––––––––––––––––––––––––––––––

Before Elrod, *Chief Judge*, and Smith and Graves, *Circuit Judges*.

Jennifer Walker Elrod, Chief Judge:[*]

Adam Aron is Chief Executive Officer of AMC Entertainment Holdings. Nelson Willis was an AMC shareholder. In March 2023, AMC held a meeting for its shareholders to vote on a proposed reverse stock split and merger. Willis was hospitalized when that vote occurred but maintains that, although he did not receive "his AMC proxy statement," he cast his vote

––––––––––––––––––

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-40585

"against the March 14th, 2023, proposals for a reverse split and merger . . . while lying down in his hospital bed."  Despite Willis's efforts, the proposal was approved.

Willis alleges that upon learning of the proposal's success, he "expressed his frustration" by sending several emails to the AMC Investor Relations email account.  Receiving no response, Willis's "patience ran thin."  So, he "sent an angry email" to Aron "asking how [Aron could] advertise [that] the voting proposals of a reverse split and merger were approved by shareholders when many shareholders such as [Willis] never received the correct number of their proxy voting emails" and were, therefore, unable "to vote all their shares."  When Aron failed to respond, Willis sent Aron several "angrier emails."  On April 3, 2023, Aron finally responded.  But Aron's response only upset Willis more.  So, Willis sent Aron an "angr[y]" response, "then began reaching out to the SEC chair" and others regarding his concerns.

As a result of Willis's "harassing behavior," Aron sought a protective order against Willis in Texas state court.  But before any protective order could be issued, Aron filed a notice of nonsuit voluntarily dismissing the state court proceeding.[1]

On August 14, 2023, Willis filed a *pro se* complaint in federal court asserting several causes of action against Aron.  Arguing that the causes of action asserted therein arose out of the now–dismissed state court proceeding, Aron moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  After ruling on a myriad of motions, objections, and other filings by the parties (most of which were initiated by Willis), the

---

[1] Aron's notice of nonsuit was filed before the state court held any hearings or otherwise ruled on the motion for protective order.

magistrate judge turned her attention to Aron's motion to dismiss Willis's complaint. The magistrate judge determined that by voluntarily dismissing the state court action regarding the protective order, Aron had in fact terminated that proceeding. As such, the magistrate judge recommended that the district court grant Aron's motion. Willis filed multiple objections to that recommendation. The district court conducted a *de novo* review of Willis's objections and determined that they were "without merit as to the ultimate findings of the Magistrate Judge." So, the district court overruled Willis's objections, adopted the magistrate judge's report and recommendation as "the findings and conclusions of the [c]ourt," and dismissed Willis's claims with prejudice. Willis timely appealed.

"We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss." *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011). "Further, this court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Const., Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). Thus, a Rule 12(b)(6) dismissal is appropriate only where a plaintiff's claims fail to contain "'sufficient factual matter'" that when "'accepted as true,'" state "'a claim to relief that is plausible on its face.'" *Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[2]

---

[2] We have held that "[a]llegations of *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers." *Rogers*, 709 F.3d at 407. "'[B]ut *pro se* plaintiffs must still plead factual allegations that raise the right to relief above the speculative level.'" *Arvie v. Cathedral of Faith Missionary Baptist Church*, 2025 WL 1565149, at *1 (5th Cir. June 3, 2025) (quoting *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 469 (5th Cir. 2016)).

No. 24-40585

On appeal, Willis complains that the district court dismissed his claims based on a "procedurally invalid nonsuit that was never finalized by judicial order, in direct violation of Texas Rule of Civil Procedure 162 and *Epps v. Fowler*, 351 S.W.3d 862 (Tex. 2011)." He urges that the "underlying state court docket . . . remains open" and Aron's nonsuit was a "procedural impropriety." On this basis, Willis persists that by dismissing his claims, the district court denied him "due process" and failed "to adjudicate [his] motions on the merits." We disagree.

Willis does not on appeal address the merits of the magistrate judge's report and recommendation which the district court adopted and we find persuasive.[3] Willis's only "merits" challenge is that "the district court's ruling was predicated on misrepresented facts" because "no valid dismissal order was ever entered in the state court proceedings," and the "magistrate's recommendation ignored material objections, exhibits, and the open state docket."

Our review of the record reveals that Aron filed his notice of nonsuit in the state court proceeding on July 31, 2023. Willis then filed his federal complaint some 14 days *later* on August 14, 2023. Thus, the state court action was terminated *before* Willis initiated the federal court proceeding. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010) (quoting *Univ. of Tex. Med. Branch at Galveston v. Est. of Blackmon ex rel. Shultz*, 195 S.W.3d 98, 100 (Tex. 2006) ("A nonsuit 'extinguishes a case or controversy "from the moment the motion is filed" [no court order is required], the only

---

[3] We will not "raise and discuss" legal issues that Willis does not raise on appeal. *Brinkmann*, 813 F.2d at 748 (citing *Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) ("Claims not pressed on appeal are deemed abandoned.")); *see also Olgin v. Darnell*, 664 F.2d 107, 108 n.1 (5th Cir. 1981) (same).

requirement is "the mere filing of the motion with the clerk of the court.'")). Thus, Willis's argument that the state court proceeding remains open is unveiling.

The record further reveals that the magistrate judge considered and ruled on numerous motions, objections, and other filings by Willis.[4] Willis argues that the district court erred in "adopt[ing] the magistrate's recommendation without addressing [his] . . . detailed objections, motions, and supporting exhibits." As stated above, in a very thorough report and recommendation, the magistrate judge concluded that Willis's claims should dismissed pursuant to Rule 12(b)(6). The district court conducted a *de novo* review of Willis's objections, then upon determination that those objections were without merit, the district court overruled them. In agreement with the magistrate judge's conclusion that Willis had already "pleaded his best case for all three causes of action," the district court dismissed Willis's claims with prejudice.[5] Willis has not demonstrated that the district court erred in

---

[4] Our review of the record reveals that Willis bombarded the court with numerous filings including, *inter alia*, motions: for emergency halt cease-and-desist; for temporary restraining order; to unseal documents and evidence; to compel; civil remedies and request for grand jury investigation; to supplement the record; alleging fraudulent conveyance and demand for action; summary judgment; to remove district judge; to strike; to remove magistrate judge; to take judicial notice; for reconsideration; and for sanctions. Willis also filed numerous objections to the various reports and recommendations by the magistrate judge.

The record on appeal shows that Willis continues this practice of voluminous filings in our court.

[5] Generally, "[i]f dismissal of a *pro se* complaint is warranted, it should be without prejudice to allow [the plaintiff] to file an amended complaint." *Moawad v. Childs*, 673 F.2d 850, 851 (5th Cir. 1982). But dismissal with prejudice may be appropriate where "the plaintiff has alleged his best case." *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998).

No. 24-40585

dismissing his claims with prejudice. *Welsh v. Cammack*, 2024 WL 3649583, at *6 (5th Cir. Aug. 5, 2024).

The district court's dismissal with prejudice of Willis's claims is AFFIRMED.