24-40585

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

### Nelson E. Willis,
### Plaintiff-Appellant,

### v.

### Adam M. Aron,
### Defendant-Appellee,

## On Appeal From The
## UNITED STATES DISTRICT COURT
## For The Eastern District of Texas

## MOTION FOR RECONSIDERATION OF
## COURT ORDER DENYING DOC. 143
### Filed under FRAP 27, Rule 40(b)(2), Rule 40(d)(1), Rule 2, and
### invoking Due Process and Judicial Integrity
### (Re: The Denial of Motion for Reconsideration of Clerk Order, Doc. 139)

**TO THE JUDGES OF THE FIFTH CIRCUIT**:

**This is going to the Supreme Court.**

**The entire judiciary, attorneys for the defendant, now clerks have dodge the entire coarse of events that transpired in the 235th District Court. The Judiciary and Counsel and Clerks have evaded the truth like the defendant evaded lawfully served subpoenas after the first day of hearings had taken place.This evasion will be your downfall.**

This Court and the lower court are now complicit in the coverup of massive securities fraud and the emails embedded within this document between AMC Entertainment, AMC CEO and Board members, Citigroup Global Markets, Citigroup Derek Van Zandt, Antara Capital, Antara Himanshu Gulati, B. Riley Financial, DF King and others is unequivocal proof of massive securities fraud, institutionallly and corporately memorialized as PROJECT POPCORN.

APPELLANT - is not a stalker, appellant is not a disgruntled shareholder, repellent is a whistleblower that Adam Aron came after and has been evading across three jurisdictions and this panel just rubber stamped their crimes.

This Court and its officers have stripped, and deprived Appellant of every meaningful legal right—including the right to present unrebutted evidence, obtain judgment, and appear before an impartial tribunal—in violation of the Fourteenth Amendment.

Not one judge across three jurisdictions—state, district, or appellate—has acknowledged that the first day of hearing in the 235th District Court had already commenced. The case was in active litigation. A second day of hearing was scheduled. Appellant had time to subpoena AMC Vice President of Investor Relations, John Merriwether, and did so. The subpoenas were lawfully served on July 31, 2023, at 8:30 AM. Ten minutes before 5 PM that same day, defense counsel filed a nonsuit—after the hearing had commenced and after subpoenas had been executed. This is a direct violation of Texas Rule of Civil Procedure 162 and a violation of Epps v. Fowler, 351 S.W.3d 862 (Tex. 2011).

At the July 21 hearing, Adam Aron was a no-show. His counsel attempted to proceed by affidavit only—without the CEO present, and without live questioning or cross-examination. When the judge asked where the petitioner was, the attorney falsely claimed he was "right here." The judge had to ask a second time, because Adam Aron was not present. That attorney attempted to continue prosecution against Appellant without the client. Meanwhile, the judge announced on record that the court would "not be discussing fiduciary duties here today," limiting Appellant's ability to build the case from the start.

This chain of events has been intentionally suppressed in every docket since. Not one judge, not one clerk, has acknowledged the hearings, the subpoenas, or the defense's procedural evasion through the nonsuit. Every court has erased critical facts and withheld evidence—specifically, evidence that confirms live hearings were underway and discovery had begun. These are not oversights; this is active judicial suppression of certified procedural facts, obstructing a lawful whistleblower claim tied to documented securities fraud.

Chief Judge Jennifer Walker Elrod just endorsed securities fraud in the Denial of Appellant's Motion For Reconsideration (Doc143).

Appellant notes that this denial, were it not so constitutionally offensive, might be mistaken for satire.

Ignoring every email between AMC, Citigroup. Antara Capital, B. Riley Financial, D.F. King. Planning the execution of a Rigged-Shareholder Vote to effectuate an Illegal 10:1 Reverse Stock Split defrauding shareholders and stealing their shares to enrich debtholders, market makers and insiders. In the most complex securities fraud case that is the largest in world financial history.

Appellant looks forward to presenting this record to the Supreme Court—and to exposing this tribunal's complicity in suppressing the truth.

This court has committed fraud on the court. Plain and simple. And has allowed the defense to say nothing except lies and Doc.95. A procedural surrender.

This Court has committed fraud on the court. Plain and simple.

It has allowed the defense to say nothing of substance—offering only lies and a single non-responsive filing, CA5 Doc. 95—a procedural surrender that failed to rebut any controlling evidence or motion. Rather than enforce the rules of appellate procedure and judicial integrity, this Court has chosen to shield the Defendant by suppressing evidence, ignoring subpoenas, and erasing hearings from the record.

This Court and the lower court are now actively complicit in the cover-up of the largest institutional securities fraud in modern history. Embedded in this filing are internal emails between AMC Entertainment, CEO Adam Aron, Board members, Citigroup Global Markets (including Derek Van Zandt), Antara Capital (including Himanshu Gulati), B. Riley Financial, and D.F. King—emails that internally and unambiguously memorialize a coordinated corporate conspiracy called "Project Popcorn." These are not speculative allegations. These are their own words: planning a rigged shareholder vote, illegally executing a 10:1 reverse split, diluting retail, and enriching institutional debtholders—all while evading subpoenas and suppressing discovery.

Appellant is not a stalker, not a disgruntled investor—Appellant is a whistleblower who pursued the truth through three jurisdictions, only to watch this Court rubber-stamp a criminal enterprise by denying judicial review and suppressing unrebutted, certified evidence already in the eROA.

Make no mistake—this will be escalated to the United States Supreme Court, and it will be made public. The media will soon report how this Court knowingly ignored emails detailing securities fraud, vote manipulation, and deliberate evasion of subpoenas. You cannot bury this. You are now part of it.

## INTRODUCTION

Appellant respectfully demands reconsideration of this Court's July 18, 2025 ruling denying Doc. 143 (Motion for Reconsideration of Clerk Order denying Motion for Leave to Exceed Word Limit, Doc. 139). That ruling, issued alongside a grant of extension (Doc. 144), constitutes an intentional suppression of certified, unrebutted eROA evidence including internal emails

proving securities fraud and subpoena evasion by Defendant Adam Aron and co-conspirators at AMC, Citigroup, Antara Capital, D.F. King, and B. Riley Securities.

**This Court is now formally placed on notice that it has erased all record of:**
**1. A live hearing on July 21, 2023;**
**2. Subpoenas served July 31, 2023 on AMC VP John Merriwether;**
**3. A deliberate Rule 162 violation via that EVASIVE MOMSUIT;**
**4. Verified pleadings that were procedurally controlling;**
5. Multiple unrebutted filings that proved fraud, collusion, and systemic evasion of judicial review.

## I. ITEMIZED TIMELINE OF PROCEDURAL ERASURE

1. **July 21, 2023: First hearing held in the 235th District Court (Texas). Adam Aron fails to appear. Defense attempts to rely on affidavit in lieu of testimony.**

2. **August 7, 2023: Second hearing scheduled.**

3. **July 26, 2023: Judge Janelle Haverkamp approves Appellant's motion to serve subpoenas on AMC's VP of Investor Relations.**

4. **July 31, 2023 at 8:30 AM: AMC VP John Merriwether served with subpoenas.**

5. **July 31, 2023 at 4:50 PM: Defense counsel Rick Illmer files strategic nonsuit—in direct violation of TRCP 162 and Epps v. Fowler, 351 S.W.3d 862 (Tex. 2011).**

6. **August 14, 2023: Appellant files Verified Complaint in federal court.**

7. **August 28, 2023: Defense moves to dismiss, citing the illegal nonsuit as justification.**

8. **October 2023–January 2024: The Eastern District of Texas ignores all references to hearings, subpoenas, and TRCP 162.**

9. **February–April 2024: Appellant files controlling summary judgment motion and Affidavit of Merit in Fifth Circuit (Docs. 43, 67-1, 67-2, 79, 84).**

10. **June 2025: Appellee files Doc. 95, explicitly failing to rebut Docs. 50, 45, 67, 68, and the unrebutted EROA.**

## II. CERTIFIED eROA EVIDENCE WAS SUPPRESSED

Appellant resubmitted Section 2 of his Petition for Rehearing—detailing the internal communications between AMC, Citigroup, Antara Capital, D.F. King, and B. Riley—as an embedded segment in Doc. 143. These emails prove:

• A covert scheme to manipulate vote outcomes;
• Synthetic share dilution of retail investors;
• A coordinated cover-up effort once subpoenas were authorized.

This is unrebutted, certified evidence—yet this Court suppressed it through a technical ruling that recasts fraud and criminality as a word count dispute.

## III. THE CLERK'S ROLE IN PROCEDURAL SABOTAGE

Doc. 139 (Clerk denial) was unlawfully treated as final and discretionary. Appellant's original Objection was docketed July 11, 2025 (Doc. 142-1) and misclassified as a "letter," despite compliance with FRAP 40(d)(1).

Doc. 143 was a judicial demand for reconsideration under Rule 40(b)(2)—not a redundant letter. The Clerk's interference suppressed both filings and attempted to bury the very emails that form the heart of Appellant's evidence.

## IV. VIOLATION OF DUE PROCESS & RULE 2

By denying Doc. 143 and ignoring the evidence embedded therein, this Court has:

• Denied Appellant the right to present critical evidence;
• Used procedural pretext (word limits) to shield institutional actors;
• Violated Rule 2's mandate to suspend technical requirements to prevent injustice;
• Subverted FRAP 40(d)(1) and Rule 27(b) by denying judicial review of Clerk misconduct.

## V. APPELLATE DEMAND FOR JUDICIAL ACCOUNTABILITY

This Court must now either:

1. Reverse its July 18 denial of Doc. 143 and enter judgment for Appellant; or

2. Explicitly explain how certified, unrebutted emails detailing securities fraud and subpoena obstruction are irrelevant to a Petition for Rehearing.

No middle ground remains. This Court has been handed proof of institutional evasion across three jurisdictions. Appellant will immediately escalate to the Supreme Court of the United States if this evidence continues to be buried.

**VI.  Now this court will read the emails that the defense and the judges have been ignoring and filings, and all jurisdictions.**

## FORCENSIC ANALYSIS: INTERNAL AMC-CITIGROUP COMMUNICATIONS PROVING INTENTIONAL SHAREHOLDER FRAUD, VOTE MANIPULATION, AND RETALIATORY COVER-UP

The internal emails embedded directly below this analysis form a direct evidentiary trail of the scheme that precipitated the fraudulent nonsuit and premeditated strategy to disenfranchise shareholders and theft of their rights and shares. These communications-exchanged between May and December 2022 by AMC executives, Citigroup bankers, external vote-rigging consultants at D.F. King, and financial strategists at B. Riley Financial-establish that the March 14, 2023 shareholder vote was structurally prearranged.

The Defendant fled discovery only after realizing these internal communications would be exposed through lawful subpoena

. • May 17, 2022 - D.F. King outlines a vote-simulation model designed to manipulate proxy outcomes using NYSE "routine" voting rules, broker discretionary authority, and custodial forecasting. It details how vote thresholds could be manufactured by targeting uninstructed shares-despite clear evidence of collapsing retail support.

• May 27, 2022 - B. Riley Financial, in coordination with AMC executives and legal counsel at Duane Morris LLP, proposes a super-voting preferred structure. The exchange shows early efforts to shape vote control mechanisms while masking dilution and regulatory scrutiny-proving premeditation.

• July 21, 2022 - Internal communications confirm AMC's plan to register 1 billion PEUs-not just for a dividend, but to fund an ATM cash-raise through synthetic dilution. Executives acknowledge anticipated backlash: "We will get ire no matter what the number is."

• December 8, 2022 - Citigroup coordinates a final vote-buying agreement with Antara Capital. AMC commits to bond repurchases and securing a rigged vote in exchange for Antara's loyalty and APE sale restrictions. Citigroup also demands input on the press release--exposing the use of public disclosures as investor misdirection.

• "Project Popcorn: Follow-Up Items" (Doc. 109-2) - Citigroup's internal planning memo outlines the structuring and timing of APE offerings, including automatic sales of unused rights, offering cancellation thresholds, and narrative management for investor optics. This is not speculation. These are the Defendant's own communications already on file in this tribunal and the lower court, judicially noticed, procedurally unrebutted, and ignored by the Panel. The nonsuit was not a defense. It was a concealment tactic. And Project Popcorn

a massive Clean-Up Operation that runs very deep. The Appellant's subpoenas were a direct threat to that suppression.

**The Defendant ran.**

**The Court buried it.**

## BELOW ARE EMAILS SUBMITTED AS EVIDEMCE IN THE LOWER COURT AND THIS COURT DOC50.

Date: Thursday, December 8 2022 03:11 PM Subject: RE: Antara From: Van Zandt, Derek

«derek.vanzandt@citi.com (mailto:derek.vanzandt@citi.com)> To: Adam Aron <AAron@amctheatres.com (mailto:AAron@amctheatres.com)>; Sean Goodman «SeGoodman@amctheatres.com ( mail to: SeGoodman@amctheatres.com )>: Kevin Connor «KConnor@amctheatres.com (mailto:KConnor@amctheatres.com)>; CC: Gonzalez, Cristian < cristian.gonzalez@citi.com (mailto:cristian.gonzalez@citi.com)>; Mikullitz, Mark <mark.mikullitz@citi.com ( mail to: mark.mikullitz@citi.com )>; Kak, Shiv «Shiv.Kak@citi.com (mailto:Shiv.Kak@citi.com)>; Meadows, Cass <cass.meadows@citi.com (mailto:cass.meadows@citi.com)>;

Just spoke with Himanshu. He was very positive on yesterday's meeting. They want to proceed but are limited to $150mm in size due to risk limits but believe they can stretch it to $190mm with the repurchase of their $100mm face of 21s at 40. He is willing to allocating value to the bonds to provide for a higher APE price but we need to think this through. $190mm purchase of APEs at 20°/o discount. AMC purchases their $100mm 2L notes @ 40. AMC commits to proceeding with vote.

Antara agrees to hold shares until vote and vote in favor. He wants AMC restricted from selling more APEs until after the vote including converts. Restriction lifted if APES >$3. Also, willing to be supportive of AMC adding more liquidity from A TM program if >$3. Wants participation in 8k/ Press release drafting. Available for public information diligence on Monday in KC (Adam and/ or Sean). Target transaction timeframe next week.

 From: Van Zandt, Derek [ICG-BCMA] Sent: Thursday, December 8, 2022 1:19 PM To: Adam Aron (aaron@amctheatres.com (mailto:aaron@amctheatres.com)); Sean Goodman Subject: Antara Adam / Sean –

 Attached is a preliminary ownership and vote analysis based on various investment scenarios with Antara. We probably need to discuss size considerations relative to 20% threshold with your lawyers and any governance/ control implications. I am talking to Antara at 2pm ET to connect following vesterday's lunch. Derek From: Weinberg, Geoffrey gweinberg@dfking.com (mailto:gweinberg@dfking.com)> Sent: Tuesday, May 17,

2022 8:31 PM To: Kevin
Connor KConnor@amctheatres.com (mailto:KConnor@amctheatres.com)>;Eddie
Gladbach EGladbach@amctheatres.com ( mail to :EGlad bach@amctheatres.com )> Cc: Taitt-
Harmon, Mercedez Mercedez. Taitt-Harmon@weil.com (mailto:TaittHarmon@weil.com)>;
Chivers, Corey corey.chivers@weil.com ( mailto: corey.chivers@weil.com )>; Stein,
Michael Michael.Stein@weil.com (mailto:Michael.Stein@weil.com)>; Scrudato,
Krystal kscrudato@dfking.com (mailto:kscrudato@dfking.com)>

Subject: Re: AMC - Preferred Issuance Kevin As discussed, for the preferred structure to be
successful, the votes cast must be at least 50%, + 1 FOR. This is effectively a majority of votes
cast standard and a much lower threshold than our previous voting standard of majority of shares
outstanding where we required FOR votes from 50% + 1 of the entire shareholder base, not just
those that actually vote. From there, the question becomes the likelihood that we would receive
support from a majority of votes cast. Due to (i) the fact that institutional shareholders do not like
to vote until just prior to the meeting and ii) that both previous votes were pulled at least a week
prior the meeting, our analysis is focused on

(a) the vote up until the day that the proposal was withdrawn,

(b) certain assumptions for how the routine vote (as discussed below) would have been applied,
and

(c) how the shareholder base has changed since last year.
Based upon last year's voting, incorporating the estimated routine vote that would have been
applied, the votes cast would have been ~56% FOR prior to the institutions voting, with a
~31.Smn vote difference between FOR and against.

Based upon certain assumptions of what institutional shares would have been voted after the
proposal was withdrawn, taking a conservative approach, an additional l0mn FOR votes would
have been added, increasing the FOR 0/4 to 57.7% and the vote difference to 41.Smn shares.

We start with an advantage in achieving a majority of votes FOR as NYSE should consider this
proposal a "routine proposal" –

this means that brokers that still maintain their discretionary voting authority will apply that
voting authority to vote their customers' uninstructed accounts. These vote in two different ways:

• Discretionary voting - where brokers will vote any uninstructed shares with management's
recommendations; ~64 mn shares as of the latest available data, of which we would anticipate
splitting 53mn FOR/ llmn against based upon previous voting patterns.

 • Proportionate voting - where brokers will vote any uninstructed shares in the same proportion
that their instructed shares were voted (e.g., Broker X has l0mn customers' shares, 2mn vote, lmn
of the 2mn that vote, vote FOR - the remaining 8mn uninstructed shares are voted 50 / 50 FOR
and against); *103.5mn shares as of the latest available data, of which we would anticipate

splitting 27.4mn FOR/ 76.lmn against based upon previous voting patterns. Since the July 2021 vote, the shareholder base has changed as follows:

• Institutional custodial holdings have increased by ~27.4mn shares; these tend to vote in favor of the proposal and participate as well (net positive)

• Discretionary custodial holdings have decreased by 14.2mn shares; we will no longer automatically receive those positive votes at an 80%+ rate (net negative)

• Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted proportionately to how the rest of NFS' instructed shares vote. Last year these groups of shares voted 29%) FOR (net negative)

• Friendlier proportionate custodial holdings ( e.g., Goldman, MLPFS, etc.) decreased by ~ 12.5mn shares, those custodians voted overwhelmingly in favor of the proposal last year (net negative)

Based upon certain assumptions, including the likely number of shares actually votable by the index funds due to stock loan, with the same retail voting FOR rate of 28.06°/o and retail participation of 27% (compared to 25.11 % at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust,

there would be a voting spread in favor of the proposal of ~Smn shares with the votes cast split at 111 Page 51.11 °/4 FOR & 48.89% against.

This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for.

However, this 47mn share difference may be largely negated by the combined ~36.Smn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base.

With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful.

At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robin hood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%.

At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to 26.5% or below, the initial ~5m share advantage disappears.

 If helpful, attaching the latest ownership report based upon the 13F data that came due this week.

Let me know any questions. Happy to discuss.

Thanks, Geoff

DISCLAIMER: This analysis contains information provided by or derived from sources believed o be reliable and accurate. D.F. King & Co., Inc. ("King) is not responsible for any errors or omissions, or for the results obtained from the use of any such information. This Reportis provided "as is", with no guarantee of completeness, accuracy, timeliness or of the results obtained from the use of this information, and without warranty of any kind, express or implied, including, but not limited to warranties of performance, merchantability and fitness for a particular purpose.

AMC Entertainment Holdings, Inc. (the "Company") is solely responsible for any decisions, actions, or omissions taken, and, in no event will King, its affiliates, officers, directors, employees, agents, or other representatives be liable to the Company or anyone else for any errors, omissions, or for any adverse consequences resulting from the reliance on any aspect of this Report or the information contained herein.

Geoffrey Weinberg
Senior Managing Director
T: 212.786.2704
M: 917.473.2984 / 732.688.2504
 E: gwein berg@dfking.com ( mail to :gwein berg@dfking.com)

Date: Subject: From: To: Friday, May 27 2022 05:58 PM

RE: super voting pref Jon Merriman <jmerriman@brileyfin.com ( mail to :j merriman@brileyfin.com )> Sean Goodman «SeGoodman@amctheatres.com (mailto:SeGoodman@amcthea tres.com )>; John Merriwether <JMerriwether@amctheatres.com ( mail to :JMerriwether@amctheatres.com )>; CC: Patrice McNicoll <pmcnicoll@brileyfin.com ( mail to: pmcnicoll@brileyfin.com )>; Layne Rissolo <irissolo@brileyfin.com (mailto:irissolo@brileyfin.com)>; Colucci, Dean M. <DMColucci@duanemorris.com (mailto:DMColucci@duanemorris.com)>; Seery, James T. <JTSeery@duanemorris.com (mailto:JTSeery@duanemorris.com)>; Openinc_20211015_ 424B5

 (Final Prospectus - Priced Offering (S-3)).pdf;

Avingerinc_20220113_ 424B5

Attachments: (Final Prospectus - Continuous Offering (S-3)).pdf;

AgileTherapeuticsinc_20220314_ 424B5 (Preliminary Prospectus (S-3)).pdf

Weekend reading - talk soon Jon Merriman Chief Business Officer B. Riley Financial 415 500 5712 From: Jon Merriman Sent: Friday, May 27, 2022 1:40 PM To: Sean Goodman; John Merriwether Cc: Patrice McNicoll; Layne Rissolo; Colucci, Dean M.; Seery, James T.

Subject: super voting pref

Sean,

John - great to see you guys this week - thank you so much for coming out to our event

. Sean I hope you didn't have equal drama on the way home - what a story!
Suggest we get on a call with the lawyers next week and talk on this structure.

Then you and your team can get with the NYSE and see if this could work for AMC.

In the meantime Layne would you please send the Nasdaq precedents.

Copied our counsel at DM who has helped us here.

 Suggest Tuesday at l0EST to start.

 Great weekend everyone!


Jon Merriman
Chief Business Officer
B. Riley Financial
415 500 5712

PLEASE VISIT http://brileyfin.com/disclosures (http://brileyfin.com/disclosures)
ONFIDENTIAL AMC 00019707 THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER. Date: Subject:

From: To: Thursday, July 21 2022 12:40 PM Re: Citi

 Questions - PEU ATM

Sean Cioodman  John Merriwether
<JMerriwether@ametheatres.com (mailto:JMerriwether@ametheatres.com)>; Kovin Connor
<KConnor@ametheatres.com (mailto:KConnor@ametheatres.com) ; Eddie Gladbach CC:
EGlad bach@ametheatres.com p: Attachments: image00l.png; image0OI.png

Thanks John I think lB makes sense.

Defer to the lawyers regarding the 5-3.

Scan Sent from my iPhone On Jul 21, 2022, at 12:33 PM,

John Merriwether wrote:


Gentlemen, Derek called me after the call with a few logistical questions regarding the 5-3 and ATM plans .. Privileged - Redacted

• There had been some discussion about how many PEUs we would register and lB was discussed (517M for the dividend and then the remainder for the ATM).

Are we in agreement that the number is lB? There is a sweet spot somewhere that doesn't raise the shareholders' ire about dilution but also gives us the flexibility to raise the capital we want.

I think we will get ire no matter what the number is,

so does it make sense to get the ire out all at once at lB.

Thanks, John

 amo ENTERTAINMENT
John Merriwether
Vice President,
Capital Markets and Investor Relations
 OneAMiCWay
 11500 Ash Street, Leawood, (S66211 office: 913-213-2660 mobile: 239-398-8366

CONFIDENTIAUTY NOTICE: Thist tui message includingatsch rents, if ary. aintended for the person o emity to ohich it saddmased and maycortain contidential and/ar prap etary matarial. any uns nhorised reste, aso, disclosers or estrout on is provib ted, if you are rot theinterded rec plent, pease contact the sender apreply e-mali and destroy al copies of the onana message
CONFIDENTIAL 4MP nnn,Gt,Gl
THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 4:23-cv-00732-ALM-KPJ Document 109-2 Filed 09/03/24 Page 2 of 3 PagelD #:

18 Follow-Up Items Item Process Rights Offering Structure

 Would an incremental approach be preferable (1.0. multiple rights offerings, starting smaller and going larger if successfully?

Citi 2 Can shareholders also indicate interest in buying any residual rump shares?

Citi How would it work if shareholders receive fractional rights but do not have enough rights to purchase a full APE /CSE?

Could we include and what are the implications of a structure where low volume holders (1 share, 2 shares, etc) still receive a minimum of at least one full right?

What incentives are created and what are potential negative impacts?
 Citi

 Citi 5

Can rights be structured so that they are automatically sold if not exercised by a certain time?

Should there be a minimum sign-up clause where, under a certain threshold, the offering is called off?

 For example, at least 25 million or nothing.

 Timing / Messaging Citi / Counsel Citi /
Counsel identify and on-board a PR/ IR firm to assist with communication AMC I Citi

When is the optimal time to go to market: ( e g. January vs. March/ post earnings)?

 AMC What wit the timing be from announcement to ex-date for the rights? What are the consideration is setting/ determining that?

Citi What will be the UoP and narrative for investors on why AMC is accessing the markets now? AMC Shareholder Considerations What would be the mechanics of trading the fractional rights on brokerage platforms? Citi

What are the steps brokerage /trading platforms will be required to take to communicate the offer to their customers? Cite

13 How will index funds manage their rights? Cit

14 Any issues with foreign shareholders? Citi / Counsel CONFIDENTIAL AMC 00

**Appellant DEMANDS ACCOUNTABILITY.**

## **RELIEF REQUESTED**

**Appellant demands immediate judicial action and accountability. This Court must:**
**1. Vacate and reverse its July 18, 2025 denial of Doc. 143 in full;**

2. Recognize the embedded evidence in Doc. 143—including internal communications among AMC, Citigroup, Antara Capital, D.F. King, and B. Riley—as certified, dispositive, and unrebutted;

3. Enter final judgment in Appellant's favor for $51.5 million based on the procedural default and the unrebutted eROA record, including Docs. 43, 45, 50, 67-1, 67-2, 68, 79, and 107-1;

4. Issue an emergency order compelling Appellee to respond within seven (7) days to all unrebutted filings, including the Affidavit of Merit and the Section 2 evidence;

5. Alternatively, this Court must order full rehearing en banc under Rule 35(b)(1)(A) and (B), as both panel and institutional integrity are now at issue.

Appellant does not seek reconsideration for the sake of delay or redundancy—he demands correction of a judicial record tainted by fraud suppression, due process violations, and unlawful interference by the Clerk's office.

## CONCLUSION

This Court is now formally on record suppressing evidence, hearings, subpoenas, and filings that expose institutional securities fraud and deliberate evasion of judicial review.

**Enough.**

**The record is unrebutted. The evidence is certified. The suppression is unmistakable.**

**If this Court refuses to act, Appellant will proceed directly to the Supreme Court of the United States and demand for JUSTICE AND final judgment.**

Respectfully submitted,
/s/Nelson E. Willis
Nelson E. Willis
Pro Se Plaintiff-Appellant

Dated: July 22, 2025

### CERTIFICATE OF SERVICE

I certify that on July 22, 2025, a true and correct copy of the foregoing
MOTION FOR RECONSIDERATION OF COURT ORDER DENYING DOC. 143
was served via CM/ECF on all counsel of record, and that no party requires service by other means.

/s/ Nelson E. Willis
Nelson E. Willis
Pro Se Appellant

Citigroup Global Markets Inc. | Banking, Capital Markets, & Advisory

November 2021

# Project Popcorn: Follow-Up Items



Strictly Private and Confidential

**CONFIDENTIAL**



# Follow-Up Items

| # | Item | Process Owner |
|---|------|---------------|
| | **Rights Offering Structure** | |
| 1 | Would an incremental approach be preferable (i.e. multiple rights offerings, starting smaller and going larger if successful)? | Citi |
| 2 | Can shareholders also indicate interest in buying any residual rump shares? | Citi |
| 3 | How would it work if shareholders receive fractional rights but do not have enough rights to purchase a full APE / CSE? | Citi |
| 4 | Could we include and what are the implications of a structure where low volume holders (1 share, 2 shares, etc.) still receive a minimum of at least one full right? What incentives are created and what are potential negative impacts? | Citi |
| 5 | Can rights be structured so that they are automatically sold if not exercised by a certain time? | Citi / Counsel |
| 6 | Should there be a minimum sign-up clause where, under a certain threshold, the offering is called off? For example, at least 25 million or nothing. | Citi / Counsel |
| | **Timing / Messaging** | |
| 7 | Identify and on-board a PR / IR firm to assist with communication. | AMC / Citi |
| 8 | When is the optimal time to go to market (e.g. January vs. March / post earnings)? | AMC |
| 9 | What will the timing be from announcement to ex-date for the rights? What are the consideration is setting / determining that? | Citi |
| 10 | What will be the UoP and narrative for investors on why AMC is accessing the markets now? | AMC |
| | **Shareholder Considerations** | |
| 11 | What would be the mechanics of trading the fractional rights on brokerage platforms? | Citi |
| 12 | What are the steps brokerage / trading platforms will be required to take to communicate the offer to their customers? | Citi |
| 13 | How will index funds manage their rights? | Citi |
| 14 | Any issues with foreign shareholders? | Citi / Counsel |

1

citi

*IRS Circular 230 Disclosure:* Citigroup Inc. and its affiliates do not provide tax or legal advice. Any discussion of tax matters in these materials (i) is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and (ii) may have been written in connection with the "promotion or marketing" of any transaction contemplated hereby ("Transaction"). Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.

In any instance where distribution of this communication is subject to the rules of the US Commodity Futures Trading Commission ("CFTC"), this communication constitutes an invitation to consider entering into a derivatives transaction under U.S. CFTC Regulations §§ 1.71 and 23.605, where applicable, but is not a binding offer to buy/sell any financial instrument.

Any terms set forth herein are intended for discussion purposes only and are subject to the final terms as set forth in separate definitive written agreements. This presentation is not a commitment to lend, syndicate a financing, underwrite or purchase securities, or commit capital nor does it obligate us to enter into such a commitment, nor are we acting as a fiduciary to you. By accepting this presentation, subject to applicable law or regulation, you agree to keep confidential the information contained herein and the existence of and proposed terms for any Transaction.

Prior to entering into any Transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences of any such Transaction. In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any Transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice (and any risks associated with any Transaction) and our disclaimer as to these matters. By acceptance of these materials, you and we hereby agree that from the commencement of discussions with respect to any Transaction, and notwithstanding any other provision in this presentation, we hereby confirm that no participant in any Transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such Transaction.

We are required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with us. We will ask for your complete name, street address, and taxpayer ID number. We may also request corporate formation documents, or other forms of identification, to verify information provided.

Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as a solicitation with respect to the purchase or sale of any instrument. The information contained in this presentation may include results of analyses from a quantitative model which represent potential future events that may or may not be realized, and is not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, we may have a position in any such instrument at any time.

Although this material may contain publicly available information about Citi corporate bond research, fixed income strategy or economic and market analysis, Citi policy (i) prohibits employees from offering, directly or indirectly, a favorable or negative research opinion or offering to change an opinion as consideration or inducement for the receipt of business or for compensation; and (ii) prohibits analysts from being compensated for specific recommendations or views contained in research reports. So as to reduce the potential for conflicts of interest, as well as to reduce any appearance of conflicts of interest, Citi has enacted policies and procedures designed to limit communications between its investment banking and research personnel to specifically prescribed circumstances.

© 2021 Citigroup Global Markets Inc. Member SIPC. All rights reserved. Citi and Citi and Arc Design are trademarks and service marks of Citigroup Inc. or its affiliates and are used and registered throughout the world.

Citi believes that sustainability is good business practice. We work closely with our clients, peer financial institutions, NGOs and other partners to finance solutions to climate change, develop industry standards, reduce our own environmental footprint, and engage with stakeholders to advance shared learning and solutions. Citi's Sustainable Progress strategy focuses on sustainability performance across three pillars: Environmental Finance; Environmental and Social Risk Management; and Operations and Supply Chain. Our cornerstone initiative is our $100 Billion Environmental Finance Goal – to lend, invest and facilitate $100 billion over 10 years to activities focused on environmental and climate solutions.

**citi**

**CONFIDENTIAL**

AMC_00047572





**Document Complete**

Back to Top





**Date:** Thursday, December 8 2022 03:11 PM

**Subject:** RE: Antara

**From:** Van Zandt, Derek <derek.vanzandt@citi.com>

**To:** Adam Aron <AAron@amctheatres.com>; Sean Goodman <SeGoodman@amctheatres.com>; Kevin Connor <KConnor@amctheatres.com>;

**CC:** Gonzalez, Cristian <cristian.gonzalez@citi.com>; Mikulitz, Mark <mark.mikulitz@citi.com>; Kak, Shiv <shiv.kak@citi.com>; Meadows, Cass <cass.meadows@citi.com>;

Just spoke with Himanshu. He was very positive on yesterday's meeting.

They want to proceed but are limited to $150mm in size due to risk limits but believe they can stretch it to $190mm with the repurchase of their $100mm face of 2Ls at 40.

He is willing to allocating value to the bonds to provide for a higher APE price but we need to think this through.

$190mm purchase of APEs at 20% discount.

AMC purchases their $100mm 2L notes @ 40.

AMC commits to proceeding with vote.

Antara agrees to hold shares until vote and vote in favor.

He wants AMC restricted from selling more APEs until after the vote including converts. Restriction lifted if APES >$3. Also, willing to be supportive of AMC adding more liquidity from ATM program if >$3.

Wants participation in 8k / Press release drafting.

Available for public information diligence on Monday in KC (Adam and / or Sean).

Target transaction timeframe next week.

**From:** Van Zandt, Derek [ICG-BCMA]

**Sent:** Thursday, December 8, 2022 1:19 PM

**To:** Adam Aron (aaron@amctheatres.com); Sean Goodman

**Subject:** Antara

Adam / Sean – Attached is a preliminary ownership and vote analysis based on various investment scenarios with Antara. We need to confirm their existing stake size but are assuming 60mm shares for now.

We probably need to discuss size considerations relative to 20% threshold with your lawyers and any governance / control implications.

I am talking to Antara at 2pm ET to connect following yesterday's lunch.

Derek



THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

827 of 928

| | |
|---|---|
| **Date:** | Friday, May 27 2022 05:58 PM |
| **Subject:** | RE: super voting pref |
| **From:** | Jon Merriman <jmerriman@brileyfin.com> |
| **To:** | Sean Goodman <SeGoodman@amctheatres.com>; John Merriwether <JMerriwether@amctheatres.com>; |
| **CC:** | Patrice McNicoll <pmcnicoll@brileyfin.com>; Layne Rissolo <lrissolo@brileyfin.com>; Colucci, Dean M. <DMColucci@duanemorris.com>; Seery, James T. <JTSeery@duanemorris.com>; |
| **Attachments:** | OpgenInc_20211015_424B5 (Final Prospectus - Priced Offering (S-3)).pdf; AvingerInc_20220113_424B5 (Final Prospectus - Continuous Offering (S-3)).pdf; AgileTherapeuticsInc_20220314_424B5 (Preliminary Prospectus (S-3)).pdf |

Weekend reading – talk soon

Jon Merriman

**Chief Business Officer**

**B. Riley Financial**

**415 500 5712**

**From:** Jon Merriman
**Sent:** Friday, May 27, 2022 1:40 PM
**To:** Sean Goodman ; John Merriwether
**Cc:** Patrice McNicoll ; Layne Rissolo ; Colucci, Dean M. ; Seery, James T.
**Subject:** super voting pref

Sean, John – great to see you guys this week – thank you so much for coming out to our event. Sean I hope you didn't have equal drama on the way home – what a story!

Suggest we get on a call with the lawyers next week and talk on this structure. Then you and your team can get with the NYSE and see if this y could work for AMC. In the meantime Layne would you please send the Nasdaq precedents.

Copied our counsel at DM who has helped us here. Suggest Tuesday at 10EST to start.

Great weekend everyone!

Jon

Jon Merriman

Chief Business Officer

B. Riley Financial

415 500 5712

PLEASE VISIT https://brileyfin.com/disclosures/> FOR LEGAL DISCLOSURES.

CONFIDENTIAL

AMC_0001⸱

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

positive votes at an 80%+ rate (net negative)
- Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted
  ~~~~~~~~~~~ w the rest of NFS' instructed shares vote. Last year these groups of shares voted 29% FOR (net

ortionate custodial holdings (e.g., Goldman, MLPFS, etc.) decreased by ~12.5mn shares, those
~~~~~~~~~~~ d overwhelmingly in favor of the proposal last year (net negative)
Ba~~~~~~~~~~~ ,ions, including the likely number of shares actually votable by the index funds due to stock loan,

:ONFIDENTIAL                                                                    AMC_00019707

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the same retail voting FOR rate of 28.06% and retail participation of 27% (compared to 25.11% at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust, there would be a voting spread in favor of the proposal of ~5mn shares with the votes cast split at 51.11% FOR & 48.89% against. This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for. However, this 47mn share difference may be largely negated by the combined ~36.5mn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base. With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful. At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robinhood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%. At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to 26.5% or below, the initial ~5mn share advantage disappears.

If helpful, attaching the latest ownership report based upon the 13F data that came due this week.

Let me know any questions. Happy to discuss.

Thanks,

Geoff

**

DISCLAIMER: This analysis contains information provided by or derived from sources believed to be reliable and accurate. D.F. King & Co., Inc. ("King") is not responsible for any errors or omissions, or for the results obtained from the use of any such information. This Report is provided "as is", with no guarantee of completeness, accuracy, timeliness or of the results obtained from the use of this information, and without warranty of any kind, express or implied, including, but not limited to warranties of performance, merchantability and fitness for a particular purpose. AMC Entertainment Holdings, Inc. (the "Company") is solely responsible for any decisions, actions, or omissions taken, and, in no event will King, its affiliates, officers, directors, employees, agents, or other representatives be liable to the Company or anyone else for any errors, omissions, or for any adverse consequences resulting from the reliance on any aspect of this Report or the information contained herein.

**Geoffrey Weinberg**
Senior Managing Director
T: 212.786.2704
M: 917.473.2984 / 732.688.2504
E: gweinberg@dfking.com



ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| | |
|---|---|
| Date: | Thursday, July 21 2022 12:40 PM |
| Subject: | Re: Citi Questions - PEU ATM |
| From: | Sean Goodman |
| To: | John Merriwether <JMerriwether@amctheatres.com >; |
| CC: | Kevin Connor <KConnor@amctheatres.com >; Eddie Gladbach <EGladbach@amctheatres.com >; |
| Attachments: | image001.png; image001.png |

Thanks John

I think 1B makes sense.

Defer to the lawyers regarding the S-3.

Sean

Sent from my iPhone

On Jul 21, 2022, at 12:33 PM, John Merriwether wrote:

Gentlemen,
Derek called me after the call with a few logistical questions regarding the S-3 and ATM plans.
- [ **Privileged - Redacted** ]
- There had been some discussion about how many PEUs we would register and 1B was discussed (517M for the dividend and then the remainder for the ATM). Are we in agreerr ent that the number is 1B? There is a sweet spot somewhere that doesn't raise the shareholders' ire about dilution but also gives us the flexibility to raise the capital we want. I think we will get ire no matter what the number is, so does it make sense to get the ire out all at once at 1B.

Thanks,
John



**John Merriwether**
**Vice President, Capital Markets and Investor Relations**
One AMC Way
11500 Ash Street, Leawood, KS 66211
office: 913-213-2660
mobile: 239-398-8366
email: jmerriwether@amctheatres.com

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the sender or entity to which it is addressed and may contain confidential and/or proprietary material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and reply e-mail and destroy all copies of the original message.

AMC_0002029

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

🔒 static.blbglaw.com



THEATRES    kconnor@amctheatres.com
WE MAKE MOVIES BETTER  P: 913.213.2506 | M: 816.699.2542

"830 of 928" are and any attachments thereto ("e-mail") is sent by an attorney or an agent of the attorney and is intended to be confidential and for the use of only the individual or entity named above. The information may be protected by attorney/client privilege, work product immunity or other legal rules. If the reader of this message is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, you are notified that retention, dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify me at 913.213.2506 or by e-mail reply, and immediately and permanently delete this e-mail and any attachments thereto. Thank you.

**From:** Weinberg, Geoffrey gweinberg@dfking.com>
**Sent:** Tuesday, May 17, 2022 8:31 PM
**To:** Kevin Connor KConnor@amctheatres.com >; Eddie Gladbach EGladbach@amctheatres.com >
**Cc:** Taitt-Harmon, Mercedez Mercedez.Taitt-Harmon@weil.com>; Chivers, Corey corey.chivers@weil.com>; Stein, Michael Michael.Stein@weil.com >; Scrudato, Krystal kscrudato@dfking.com>
**Subject:** Re: AMC - Preferred Issuance

Kevin –

As discussed, for the preferred structure to be successful, the votes cast must be at least 50% + 1 FOR. This is effectively a *majority of votes cast standard* and a much lower threshold than our previous voting standard of *majority of shares outstanding* where we required FOR votes from 50% + 1 of the entire shareholder base, not just those that actually vote. From there, the question becomes the likelihood that we would receive support from a majority of votes cast.

Due to (i) the fact that institutional shareholders do not like to vote until just prior to the meeting and (ii) that both previous votes were pulled at least a week prior the meeting, our analysis is focused on (a) the vote up until the day that the proposal was withdrawn, (b) certain assumptions for how the *routine vote* (as discussed below) would have been applied, and (c) how the shareholder base has changed since last year.

**Based upon last year's voting, incorporating the estimated routine vote that would have been applied, the votes cast would have been ~56% FOR prior to the institutions voting, with a ~31.5mn vote difference between FOR and against. Based upon certain assumptions of what institutional shares would have been voted after the proposal was withdrawn, taking a conservative approach, an additional 10mn FOR votes would have been added, increasing the FOR to 57.7% and the vote difference to 41.5mn shares.**

We start with an advantage in achieving a majority of votes FOR as NYSE should consider this proposal a "routine proposal" – this means that brokers that still maintain their discretionary voting authority will apply that voting authority to vote their customers' uninstructed accounts.

These vote in two different ways:

- Discretionary voting - where brokers will vote *any uninstructed shares* with management's recommendations; ~64mn shares as of the latest available data, of which we would anticipate splitting 53mn FOR / 11mn against based upon previous voting patterns.
- Proportionate voting - where brokers will vote any uninstructed shares in the same proportion that their instructed shares were voted (e.g., Broker X has 10mn customers' shares, 2mn vote, 1mn of the 2mn that vote, vote FOR - the remaining 8mn uninstructed shares are voted 50 / 50 FOR and against); ~103.5mn shares as of the latest available data, of which we would anticipate splitting 27.4mn FOR / 76.1mn against based upon previous voting patterns.

Since the July 2021 vote, the shareholder base has changed as follows:

- Institutional custodial holdings have increased by ~27.4mn shares; these tend to vote in favor of the proposal and participate as well (net positive)
- Discretionary custodial holdings have decreased by 14.2mn shares; we will no longer automatically receive those positive votes at an 80%+ rate (net negative)
- Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted proportionately to how the rest of NFS' instructed shares vote. Last year these groups of shares voted 29% FOR (net negative)
  - Friendlier proportionate custodial holdings (e.g., Goldman, MLPFS, etc.) decreased by ~12.5mn shares, those custodians voted overwhelmingly in favor of the proposal last year (net negative)

Based upon certain assumptions, including the likely number of shares actually votable by the index funds due to stock loan,

CONFIDENTIAL                                                    AMC_00019707

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the same retail voting FOR rate of 28.06% and retail participation of 27% (compared to 25.11% at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust, there would be a voting spread in favor of the proposal of ~5mn shares with the votes cast split at 51.11% FOR & 48.89% against. This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for. However, this 47mn share difference may be largely negated by the combined ~36.5mn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base. With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful. At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robinhood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%. At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to