Case No. 24-40585

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

Nelson E. Willis,
Plaintiff-Appellant

v.

Adam M. Aron,
Defendant-Appellee

**MOTION TO COMPEL JUDICIAL RULING ON DOC. 155 AND TO CORRECT THE OFFICIAL DOCKET ENTRY FOR DOC. 142**

Filed Under: FRAP 27, Rule 40(d)(1), Rule 2, FRE 201, and the Due Process Clause of the Fourteenth Amendment

*<u>TO THE HONORABLE JUDGES OF THE FIFTH CIRCUIT</u>*:

Appellant expressly invokes Federal Rule of Evidence 201 and requests judicial notice of the certified, unrebutted adjudicative facts embedded in Docs. 43, 45, 50, 57-1, 57-2, 57-3, 57-4, 57-5, 77, 79, 84, 87, 95, 107-2, 134-1, 134-2, and 155. These are only the documents suppressed in this Court; Appellant is not yet listing the multitude of filings in the lower court that were likewise suppressed or ignored—including a motion for reconsideration in the district court that the magistrate judge disregarded despite the embedded evidence. Judicial notice is mandatory under FRE 201(d) when, as here, the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (Taylor v. Charter Med. Corp., 162 F.3d 827, 829 (5th Cir. 1998); Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944)). These filings include court-authorized subpoenas, internal communications between financial institutions and corporate executives, and transcript-certified procedural events which are not subject to reasonable dispute.

This isn't about judges needing to 'read opinions more closely.' In Case No. 24-40585, the Fifth Circuit had certified evidence of subpoenas served after a first hearing, a nonsuit filed to kill discovery, and internal corporate emails proving securities fraud. Every judge — from state to federal — had this evidence in front of them and refused to acknowledge it in any order. That's not a reading problem. That's suppression.

## I. JUDGES IN ALL THREE COURTS HAVE EVADED CERTIFIED EVIDENCE AND SUBPOENA HISTORY TO PROTECT A PUBLIC COMPANY CEO FROM DISCOVERY

Across three separate venues—the Texas 235th District Court, the Eastern District of Texas, and this Court—judicial officers have refused to acknowledge or address:

• Certified internal emails between AMC, Citigroup, Antara Capital, D.F. King, and B. Riley showing vote manipulation and dilution;

• The July 21, 2023 hearing on record in state court;

• Subpoenas issued and served on AMC executive John Merriweather on July 26, 2023;

• A Notice of Nonsuit filed just minutes before 5:00 PM on July 31, 2023—intended to erase all pending discovery and hostile testimony.

Rather than adjudicate these certified events and filings, every judge involved has signaled—whether on record or by deliberate omission—that Appellant will not be permitted to expose securities fraud because the defendant is a public company CEO with institutional protection.

Judges in all three courts have refused to acknowledge even the first three paragraphs of Appellant's original Appellate Brief—choosing instead to dismiss the case based on Appellant's emotional tone and medical condition, while deliberately avoiding any engagement with the unrebutted, certified evidence already in the record. That evidence includes court-authorized subpoenas, a live hearing transcript, and internal emails proving securities fraud and shareholder theft.

This Court, and the lower courts before it, have refused to even acknowledge the undisputed procedural sequence that subpoenas were served after the first day of hearings, and that a Notice of Nonsuit was filed immediately thereafter to terminate discovery. This sequence is procedural law 101, and both this Court and the lower court turned a blind eye to the fraud on the court that followed a massive violation of TRCP 162. This was a deliberate and tactical evasion of discovery designed to protect the defendant and take advantage of a man representing himself. If a pro se litigant can draw out this level of unethical conduct by both a court and a defense team, it is a disgrace to the judicial system.

The Court's continued refusal to rule on Doc. 155, which reasserts that same unrebutted record, is not a clerical delay—it is a continuation of the same institutional suppression.

In substance, the judiciary has communicated the following:

"We will allow the nonsuit to stand and suppress the subpoenas, the hearing, and your evidence—because we will not let you call the CEO names or hold him accountable, especially given his identity."

Appellant refuses to permit this Court to continue treating him as if he were an incoherent caricature—akin to Suel Forrester from Saturday Night Live—rather than a litigant presenting a certified evidentiary record and unrebutted fraud-on-the-court allegations.

—

## II. DOCUMENT 155 HAS BEEN PENDING FOR 10 DAYS WITHOUT RULING

During the August 1, 2025 phone call, Clerk Rebecca Leto confirmed:

"I do not have an order back yet from the court. It is still pending." (00:38–00:43)

Appellant filed Doc. 155 on July 22, 2025, and as of this filing on August 1, no judicial ruling has issued. This motion:
• Cites unrebutted, certified evidence embedded in the eROA including internal emails between AMC, Citigroup, Antara Capital, D.F. King, and B. Riley;
• Asserts Fifth Circuit suppression of subpoenas, a live hearing, and TRCP 162 violations in Texas state court;
• Falls squarely within FRAP 27 and Rule 40(b)(2), requiring judicial—not administrative—review.

The Clerk has acknowledged that judges have had the document since July 22 and have not acted. This constitutes procedural stalling of a document that raises serious constitutional issues under Rule 60(d)(3) standards.

## III. CLERK'S OFFICE ADMITS TO MISCLASSIFYING DOC. 142 AND "EDITING" THE ENTRY POST-FILING

Clerk Rebecca Leto confirmed that the docket entry for Appellant's July 11, 2025 filing (Doc. 142) was intentionally labeled a "Letter" despite being a formal Objection under FRAP 40(d)(1):

"We do not have an internal event to file a document as objections. A letter is a pretty… catch slash slash motion for reconsideration." (10:57–11:12)

This confession validates Appellant's prior allegation that the Clerk's mislabeling of Doc. 142 was not clerical error but a systemic tactic used to suppress judicial review. Even more concerning, Ms. Leto refused to document the change in writing:

"I do not send that in writing." (04:34)

Instead, she admitted that she had been instructed to "edit the text of the entry" to reflect the true title after the fact, confirming the docket entry itself was altered outside judicial oversight. Appellant objects that no formal Notice of Correction or Clerk's Certificate of Administrative Error was ever issued.

## IV. DUE PROCESS REQUIRES A JUDICIAL RULING ON DOC. 155 AND FORMAL CORRECTION OF DOC. 142

Under FRAP 40(d)(1), Appellant's objection to Doc. 139 (misclassified as Doc. 142) was required to be routed to a judge, not filtered through discretionary "letter" classification. The Clerk's July 11, 2025 letter acknowledges this obligation:

"The Clerk's action is subject to review by a single judge upon a motion for reconsideration made within the 14 or 45 day period set by Fed. R. App. P. 40(d)(1)."

Appellant complied with Rule 40(d)(1). The failure to submit the objection to judicial review constitutes denial of procedural due process.

Further, the suppression of Doc. 155—containing certified internal emails and unrebutted judicial misconduct allegations—demands immediate relief to preserve Appellant's rights under the Fourteenth Amendment and to prevent irreversible miscarriage of justice.

## V. RELIEF REQUESTED

Appellant respectfully demands that the Court:

1. **Immediately issue a ruling on Doc. 155, the Motion for Reconsideration of the denial of Doc. 143, filed July 22, 2025;**

2. **Correct the docket entry for Doc. 142, including:**

- Retitling the document as: "Objection and Motion for Reconsideration Under FRAP 40(d)(1)";

- Reclassifying it under the standard motion event code;

- Documenting the correction through an official Notice of Docket Entry Correction;

3. **Vacate every prior denial this Court has issued in this appeal, including the denial of the appeal itself (Doc. 131), and reverse course immediately by entering judgment in Appellant's favor in full. This relief is warranted because the record contains unrebutted, certified evidence of fraud on the court, procedural violations of TRCP 162 documented in the district court record (Doc. 113), and suppression of adjudicative facts in violation of FRE 201. Controlling authority confirms that judgments obtained through fraud on the court must be set aside and corrected: Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244–46 (1944); Rozier**

v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978); United States v. Beggerly, 524 U.S. 38, 47 (1998);

4. Order judicial review of all filings referencing certified eROA evidence, including Docs. 43, 45, 50, 57-1, 57-2, 57-3, 57-4, 57-5, 77, 79, 84, 87, 95, 107-2, 134-1, 134-2, and 155, and prohibit further suppression of those filings by the Clerk or the Court.

Respectfully submitted,
Nelson E. Willis
Pro Se Appellant
1405 County Road 208
Gainesville, TX 76240
(972) 533-4126
nelsonwillis3@gmail.com

Dated: August 4 2025

---

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, a true and correct copy of the foregoing Motion to Compel Judicial Ruling on Doc. 155 and to Correct the Official Docket Entry for Doc. 142 was served via the Court's CM/ECF electronic filing system on all registered counsel of record in this case.

Because all parties to this appeal are registered CM/ECF users, no service by mail is required.

/s/ Nelson E. Willis
Nelson E. Willis
Pro Se Appellant
1405 County Road 208
Gainesville, TX 76240
(972) 533-4126
nelsonwillis3@gmail.com

Dated: August 4, 2025

Citigroup Global Markets Inc. | Banking, Capital Markets, & Advisory

November 2021

# Project Popcorn: Follow-Up Items





Strictly Private and Confidential
CONFIDENTIAL

citi

AMC_00047570

# Follow-Up Items

| # | Item | Process Owner |
|---|---|---|
| | **Rights Offering Structure** | |
| 1 | Would an incremental approach be preferable (i.e. multiple rights offerings, starting smaller and going larger if successful)? | Citi |
| 2 | Can shareholders also indicate interest in buying any residual rump shares? | Citi |
| 3 | How would it work if shareholders receive fractional rights but do not have enough rights to purchase a full APE / CSE? | Citi |
| 4 | Could we include and what are the implications of a structure where low volume holders (1 share, 2 shares, etc.) still receive a minimum of at least one full right? What incentives are created and what are potential negative impacts? | Citi |
| 5 | Can rights be structured so that they are automatically sold if not exercised by a certain time? | Citi / Counsel |
| 6 | Should there be a minimum sign-up clause where, under a certain threshold, the offering is called off? For example, at least 25 million or nothing. | Citi / Counsel |
| | **Timing / Messaging** | |
| 7 | Identify and on-board a PR / IR firm to assist with communication. | AMC / Citi |
| 8 | When is the optimal time to go to market (e.g. January vs. March / post earnings)? | AMC |
| 9 | What will the timing be from announcement to ex-date for the rights? What are the consideration is setting / determining that? | Citi |
| 10 | What will be the UoP and narrative for investors on why AMC is accessing the markets now? | AMC |
| | **Shareholder Considerations** | |
| 11 | What would be the mechanics of trading the fractional rights on brokerage platforms? | Citi |
| 12 | What are the steps brokerage / trading platforms will be required to take to communicate the offer to their customers? | Citi |
| 13 | How will index funds manage their rights? | Citi |
| 14 | Any issues with foreign shareholders? | Citi / Counsel |

CONFIDENTIAL

citi

AMC_0004757

IRS Circular 230 Disclosure: Citigroup Inc. and its affiliates do not provide tax or legal advice. Any discussion of tax matters in these materials (i) is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and (ii) may have been written in connection with the "promotion or marketing" of any transaction contemplated hereby ("Transaction"). Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.

In any instance where distribution of this communication is subject to the rules of the US Commodity Futures Trading Commission ("CFTC"), this communication constitutes an invitation to consider entering into a derivatives transaction under U.S. CFTC Regulations §§ 1.71 and 23.605, where applicable, but is not a binding offer to buy/sell any financial instrument.

Any terms set forth herein are intended for discussion purposes only and are subject to the final terms as set forth in separate definitive written agreements. This presentation is not a commitment to lend, syndicate a financing, underwrite or purchase securities, or commit capital nor does it obligate us to enter into such a commitment, nor are we acting as a fiduciary to you. By accepting this presentation, subject to applicable law or regulation, you agree to keep confidential the information contained herein and the existence of and proposed terms for any Transaction.

Prior to entering into any Transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences of any such Transaction. In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any Transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice (and any risks associated with any Transaction) and our disclaimer as to these matters. By acceptance of these materials, you and we hereby agree that from the commencement of discussions with respect to any Transaction, and notwithstanding any other provision in this presentation, we hereby confirm that no participant in any Transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such Transaction.

We are required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with us. We will ask for your complete name, street address, and taxpayer ID number. We may also request corporate formation documents, or other forms of identification, to verify information provided.

Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as a solicitation with respect to the purchase or sale of any instrument. The information contained in this presentation may include results of analyses from a quantitative model which represent potential future events that may or may not be realized, and is not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, we may have a position in any such instrument at any time.

Although this material may contain publicly available information about Citi corporate bond research, fixed income strategy or economic and market analysis, Citi policy (i) prohibits employees from offering, directly or indirectly, a favorable or negative research opinion or offering to change an opinion as consideration or inducement for the receipt of business or for compensation, and (ii) prohibits analysts from being compensated for specific recommendations or views contained in research reports. So as to reduce the potential for conflicts of interest, as well as to reduce any appearance of conflicts of interest, Citi has enacted policies and procedures designed to limit communications between its investment banking and research personnel to specifically prescribed circumstances.

© 2021 Citigroup Global Markets Inc. Member SIPC. All rights reserved. Citi and Citi and Arc Design are trademarks and service marks of Citigroup Inc. or its affiliates and are used and registered throughout the world.

Citi believes that sustainability is good business practice. We work closely with our clients, peer financial institutions, NGOs and other partners to finance solutions to climate change, develop industry standards, reduce our own environmental footprint, and engage with stakeholders to advance shared learning and solutions. Citi's Sustainable Progress strategy focuses on sustainability performance across three pillars: Environmental Finance; Environmental and Social Risk Management; and Operations and Supply Chain. Our cornerstone initiative is our $100 Billion Environmental Finance Goal – to lend, invest and facilitate $100 billion over 10 years to activities focused on environmental and climate solutions.

CONFIDENTIAL

citi

AMC_00047572





ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| | |
|---|---|
| Date: | Thursday, July 21 2022 12:40 PM |
| Subject: | Re: Citi Questions - PEU ATM |
| From: | Sean Goodman |
| To: | John Merriwether <JMerriwether@amctheatres.com>; |
| CC: | Kevin Connor <KConnor@amctheatres.com>; Eddie Gladbach <EGladbach@amctheatres.com>; |
| Attachments: | image001.png; image001.png |

Thanks John

I think 1B makes sense.

Defer to the lawyers regarding the S-3.

Sean

Sent from my iPhone

> On Jul 21, 2022, at 12:33 PM, John Merriwether wrote:
>
> Gentlemen,
> Derek called me after the call with a few logistical questions regarding the S-3 and ATM plans.
> - **Privileged - Redacted**
> - There had been some discussion about how many PEUs we would register and 1B was discussed (517M for the dividend and then the remainder for the ATM). Are we in agreement that the number is 1B? There is a sweet spot somewhere that doesn't raise the shareholders' ire about dilution but also gives us the flexibility to raise the capital we want. I think we will get ire no matter what the number is, so does it make sense to get the ire out all at once at 1B.
> Thanks,
> John



John Merriwether
Vice President, Capital Markets and Investor Relations
One AMC Way
11500 Ash Street, Leawood, KS 66211
office: 913-213-2660
mobile: 239-398-8366
email: jmerriwether@amctheatres.com

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or proprietary material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

CONFIDENTIAL                                                          AMC_0002029

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

🔒 static.blbglaw.com

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.
827 of 928

| | |
|---|---|
| Date: | Friday, May 27 2022 05:58 PM |
| Subject: | RE: super voting pref |
| From: | Jon Merriman <jmerriman@brileyfin.com> |
| To: | Sean Goodman <SeGoodman@amctheatres.com>; John Merriwether <JMerriwether@amctheatres.com>; |
| CC: | Patrice McNicoll <pmcnicoll@brileyfin.com>; Layne Rissolo <lrissolo@brileyfin.com>; Colucci, Dean M. <DMColucci@duanemorris.com>; Seery, James T. <JTSeery@duanemorris.com>; |
| Attachments: | OpgenInc_20211015_424B5 (Final Prospectus - Priced Offering (S-3)).pdf; AvingerInc_20220113_424B5 (Final Prospectus - Continuous Offering (S-3)).pdf; AgileTherapeuticsInc_20220314_424B5 (Preliminary Prospectus (S-3)).pdf |

Weekend reading – talk soon
Jon Merriman
Chief Business Officer
B. Riley Financial
415 500 5712

From: Jon Merriman
Sent: Friday, May 27, 2022 1:40 PM
To: Sean Goodman ; John Merriwether
Cc: Patrice McNicoll ; Layne Rissolo ; Colucci, Dean M. ; Seery, James T.
Subject: super voting pref

Sean, John – great to see you guys this week – thank you so much for coming out to our event. Sean I hope you didn't have equal drama on the way home – what a story!
Suggest we get on a call with the lawyers next week and talk on this structure. Then you and your team can get with the NYSE and see if this y could work for AMC. In the meantime Layne would you please send the Nasdaq precedents. Copied our counsel at DM who has helped us here. Suggest Tuesday at 10EST to start.
Great weekend everyone!
Jon
Jon Merriman
Chief Business Officer
B. Riley Financial
415 500 5712

PLEASE VISIT https://brileyfin.com/disclosures/ FOR LEGAL DISCLOSURES

CONFIDENTIAL                                                                 AMC_00019
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.
static.blbglaw.com

●ıll Verizon 🛜              11:37 PM                              10% 🔋

830 of 928

[AMC Theatres letterhead and email confidentiality notice, partially legible]

**From:** Weinberg, Geoffrey <gweinberg@dfking.com>
**Sent:** Tuesday, May 17, 2022 8:31 PM
**To:** Kevin Connor <KConnor@amctheatres.com>; Eddie Gladbach <EGladbach@amctheatres.com>
**Cc:** Taitt-Harmon, Mercedez <Mercedez.Taitt-Harmon@weil.com>; Chivers, Corey <corey.chivers@weil.com>; Stein, Michael <Michael.Stein@weil.com>; Scrudato, Krystal <kscrudato@dfking.com>
**Subject:** Re: AMC - Preferred Issuance

Kevin –

As discussed, for the preferred structure to be successful, the votes <u>cast</u> must be at least 50% + 1 FOR. This is effectively a *majority of votes cast standard* and a much lower threshold than our previous voting standard of *majority of shares outstanding* where we required FOR votes from 50% + 1 of the entire shareholder base, not just those that actually vote. From there, the question becomes the likelihood that we would receive support from a majority of votes cast.

Due to (i) the fact that institutional shareholders do not like to vote until just prior to the meeting and (ii) that both previous votes were pulled at least a week prior the meeting, our analysis is focused on (a) the vote up until the day that the proposal was withdrawn, (b) certain assumptions for how the *routine vote* (as discussed below) would have been applied, and (c) how the shareholder base has changed since last year.

**Based upon last year's voting, incorporating the estimated routine vote that would have been applied, the votes cast would have been ~56% FOR prior to the institutions voting, with a ~31.5mn vote difference between FOR and against. Based upon certain assumptions of what institutional shares would have been voted after the proposal was withdrawn, taking a conservative approach, an additional 10mn FOR votes would have been added, increasing the FOR % to 57.7% and the vote difference to 41.5mn shares.**

We start with an advantage in achieving a majority of votes FOR as NYSE should consider this proposal a "routine proposal" – this means that brokers that still maintain their discretionary voting authority will apply that voting authority to vote their customers' uninstructed accounts.

These vote in two different ways:
- Discretionary voting - where brokers will vote *any uninstructed shares* with management's recommendations; ~64mn shares as of the latest available data, of which we would anticipate splitting 53mn FOR / 11mn against based upon previous voting patterns.
- Proportionate voting - where brokers will vote any uninstructed shares in the same proportion that their instructed shares were voted (e.g., Broker X has 10mn customers' shares, 2mn vote, 1mn of the 2mn that vote, vote FOR - the remaining 8mn uninstructed shares are voted 50 / 50 FOR and against); ~103.5mn shares as of the latest available data, of which we would anticipate splitting 27.4mn FOR / 76.1mn against based upon previous voting patterns.

Since the July 2021 vote, the shareholder base has changed as follows:
- Institutional custodial holdings have increased by ~27.4mn shares; these tend to vote in favor of the proposal and participate as well (net positive)
- Discretionary custodial holdings have decreased by 14.2mn shares; we will no longer automatically receive those positive votes at an 80%+ rate (net negative)
- Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted proportionately to how the rest of NFS' instructed shares vote. Last year these groups of shares voted 29% FOR (net negative)
  - Friendlier proportionate custodial holdings (e.g., Goldman, MLPFS, etc.) decreased by ~12.5mn shares, those custodians voted overwhelmingly in favor of the proposal last year (net negative)

Based upon certain assumptions, including the likely number of shares actually votable by the index funds due to stock loan,

CONFIDENTIAL                                                                    AMC_00019707

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the same retail voting FOR rate of 28.06% and retail participation of 27% (compared to 25.11% at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust, <u>there would be a voting spread in favor of the proposal of ~5mn shares with the votes cast split at 51.11% FOR & 48.89% against</u>. This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for. However, this 47mn share difference may be largely negated by the combined ~36.5mn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base. With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful. At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robinhood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%. At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to

🔒 static.blbglaw.com

- positive votes at an 80%+ rate (net negative)
- Proportionate custodial holdings at NFS (Fidelity) have increased by ~24mn shares; these new shares will be voted [...] the rest of NFS' instructed shares vote. Last year these groups of shares voted 29% FOR (net [...] rtionate custodial holdings (e.g., Goldman, MLPFS, etc.) decreased by ~12.5mn shares, those [...] d overwhelmingly in favor of the proposal last year (net negative)

Ba[...]ons, including the likely number of shares actually votable by the index funds due to stock loan,

CONFIDENTIAL                                                                 AMC_00019707
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the same retail voting FOR rate of 28.06% and retail participation of 27% (compared to 25.11% at the time the July proposal was withdrawn), before applying any additional institutional votes outside of the index funds, Geode and Northern Trust, there would be a voting spread in favor of the proposal of ~5mn shares with the votes cast split at 51.11% FOR & 48.89% against. This provides a ~44% quorum as compared to a ~53% quorum at the July meeting, implying another 47mn shares unaccounted for. However, this 47mn share difference may be largely negated by the combined ~36.5mn shares that will not automatically be voted via decreases at discretionary and proportionate voting custodians.

As can be seen in the movement referenced above, especially at NFS, this analysis is based upon a moving target due to the volume and volatility of the shareholder base. With certain assumptions I believe that the unaccounted-for shares referenced above would more likely than not be favorable shares through hedge funds and institutions, and when combined with certain campaign strategies that would be altered to account for the lower voting threshold, this campaign would ultimately be successful. At the same time, it is worth noting that at the original May meeting, using a combined average of the top retail custodians (TD, NFS, Robinhood, Schwab and Apex) as a proxy for the retail vote, retail voted FOR at 33.5%. At the July meeting, this same group voted FOR at 28.06%. Based on the high-level analysis mentioned, if the retail FOR vote moves to 26.5% or below, the initial ~5mn share advantage disappears.

If helpful, attaching the latest ownership report based upon the 13F data that came due this week.

Let me know any questions. Happy to discuss.

Thanks,
Geoff

**DISCLAIMER:** This analysis contains information provided by or derived from sources believed to be reliable and accurate. D.F. King & Co., Inc. ("King") is not responsible for any errors or omissions, or for the results obtained from the use of any such information. This Report is provided "as is", with no guarantee of completeness, accuracy, timeliness or of the results obtained from the use of this information, and without warranty of any kind, express or implied, including, but not limited to warranties of performance, merchantability and fitness for a particular purpose. AMC Entertainment Holdings, Inc. (the "Company") is solely responsible for any decisions, actions, or omissions taken, and, in no event will King, its affiliates, officers, directors, employees, agents, or other representatives be liable to the Company or anyone else for any errors, omissions, or for any adverse consequences resulting from the reliance on any aspect of this Report or the information contained herein.

**Geoffrey Weinberg**
Senior Managing Director
T: 212.786.2704
M: 917.473.2984 / 732.688.2504
E: gweinberg@dfking.com

| | |
|---|---|
| Date: | Thursday, December 8 2022 03:11 PM |
| Subject: | RE: Antara |
| From: | Van Zandt, Derek <derek.vanzandt@citi.com> |
| To: | Adam Aron <AAron@amctheatres.com>; Sean Goodman <SeGoodman@amctheatres.com>; Kevin Connor <KConnor@amctheatres.com>; |
| CC: | Gonzalez, Cristian <cristian.gonzalez@citi.com>; Mikullitz, Mark <mark.mikullitz@citi.com>; Kak, Shiv <shiv.kak@citi.com>; Meadows, Cass <cass.meadows@citi.com>; |

Just spoke with Himanshu. He was very positive on yesterday's meeting.
They want to proceed but are limited to $150mm in size due to risk limits but believe they can stretch it to $190mm with the repurchase of their $100mm face of 2Ls at 40.
He is willing to allocating value to the bonds to provide for a higher APE price but we need to think this through.
$190mm purchase of APEs at 20% discount.
AMC purchases their $100mm 2L notes @ 40.
AMC commits to proceeding with vote.
Antara agrees to hold shares until vote and vote in favor.
He wants AMC restricted from selling more APEs until after the vote including converts. Restriction lifted if APES >$3. Also, willing to be supportive of AMC adding more liquidity from ATM program if >$3.
Wants participation in 8k / Press release drafting.
Available for public information diligence on Monday in KC (Adam and / or Sean).
Target transaction timeframe next week.

From: Van Zandt, Derek [ICG-BCMA]
Sent: Thursday, December 8, 2022 1:19 PM
To: Adam Aron (aaron@amctheatres.com); Sean Goodman
Subject: Antara

Adam / Sean – Attached is a preliminary ownership and vote analysis based on various investment scenarios with Antara. We need to confirm their existing stake size but are assuming 60mm shares for now.
We probably need to discuss size considerations relative to 20% threshold with your lawyers and any governance / control implications.
I am talking to Antara at 2pm ET to connect following yesterday's lunch.
Derek



Date: Thursday, December 8 2022 03:11 PM
Subject: RE: Antara
From: Van Zandt, Derek <derek.vanzandt@citi.com>
To: Adam Aron <AAron@amctheatres.com>; Sean Goodman <SeGoodman@amctheatres.com>; Kevin Connor <KConnor@amctheatres.com>;
CC: Gonzalez, Cristian <cristian.gonzalez@citi.com>; Mikullitz, Mark <mark.mikullitz@citi.com>; Kak, Shiv <shiv.kak@citi.com>; Meadows, Cass <cass.meadows@citi.com>;

Just spoke with Himanshu. He was very positive on yesterday's meeting.
They want to proceed but are limited to $150mm in size due to risk limits but believe they can stretch it to $190mm with the repurchase of their $100mm face of 2Ls at 40.
He is willing to allocating value to the bonds to provide for a higher APE price but we need to think this through.
$190mm purchase of APEs at 20% discount.
AMC purchases their $100mm 2L notes @ 40.
AMC commits to proceeding with vote.
Antara agrees to hold shares until vote and vote in favor.
He wants AMC restricted from selling more APEs until after the vote including converts. Restriction lifted if APES >$3. Also, willing to be supportive of AMC adding more liquidity from ATM program if >$3.
Wants participation in 8k / Press release drafting.
Available for public information diligence on Monday in KC (Adam and / or Sean).
Target transaction timeframe next week.

From: Van Zandt, Derek [ICG-BCMA]
Sent: Thursday, December 8, 2022 1:19 PM
To: Adam Aron (aaron@amctheatres.com); Sean Goodman
Subject: Antara

Adam / Sean – Attached is a preliminary ownership and vote analysis based on various investment scenarios with Antara. We need to confirm their existing stake size but are assuming 60mm shares for now.
We probably need to discuss size considerations relative to 20% threshold with your lawyers and any governance / control implications.
I am talking to Antara at 2pm ET to connect following yesterday's lunch.
Derek

